UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION—DETROIT

| | |
|---|---|
| IN RE MICHAEL E. MCINERNEY,<br><br>*Debtor*.<br>_______________________________/ | CHAPTER 7<br>CASE NO. 11-58953<br>JUDGE THOMAS J. TUCKER |

**ALAN ACKERMAN AND ACKERMAN ACKERMAN & DYNKOWSKI'S OBJECTION TO CHAPTER 7 TRUSTEE, GENE KOHUT'S SETTLEMENT MOTION REGARDING *MCINERNEY V. BECKER ET AL.***

## Preliminary Statement

If the pending appeal, which Mr. Kohut seeks to settle, is instead allowed to move forward, and the underlying lawsuit tried on the inevitable remand, then the estate can expect a judgment in excess of $9 million. In contrast, the proposed settlement will bring in a gross amount of only $250,000. And—after accounting for the Ackerman Firm's charging lien and Ch. 7 administrative expenses—the $250,000 will dwindle to less than $50,000, which will be absorbed by the administrative and priority claims of the Michigan Department of Treasury. Unsecured creditors will see nothing. As a result, the settlement doesn't meet the standards for court approval and the Court may deny Mr. Kohut's motion.

## Background

A full background to Mr. Kohut's settlement motion appears in the appellate brief filed by Debtor, Michael McInereny ("McInerney"), which Mr. Kohut attached to his settlement motion. The objecting parties (Alan Ackerman ("Ackerman"), individually, and Ackerman Ackerman & Dynkowski (the "Ackerman Firm")) incorporate the appellate brief by reference.[1]

---

[1] An affidavit from Alan Ackerman in support of various points raised in this objection is attached as Exhibit 1.

Nevertheless, a brief summary is in order:

In February 1998, McInerney and Charles E. Becker ("Becker") formed Becker Ventures, LLC ("Becker Ventures") as an investment vehicle. Under the initial operating agreement, Becker owned 80% and McInerney owned 20%. Between 1999 and 2001, McInerney gradually relinquished his equity interest, with a total divestment effective January 1, 2001. Nevertheless, throughout this period, and after, McInerney remained as Becker Ventures' manager.

In consideration for McInerney relinquishing his membership interest, Becker or Becker Ventures or both agreed that McInerney would receive 15% of future cash flow from certain real estate investments (the "15% Agreement"). The promise to pay 15%, originally made in 1999, was repeated many times, until McInerey's eventual departure from Becker Ventures.

The 15% Agreement, however, which is also the basis for the lawsuit Mr. Kohut seeks to settle, was never formalized in a single document. Nevertheless, the agreement was reflected in e-mails in Becker Ventures' possession. These e-mails were eventually deleted. And as discussed below, the deletion of these e-mails is the key issue in the pending appeal.

Eventually, the relationship between McInerney and Becker/Becker Ventures deteriorated. In July 2007, McInerney resigned as the manager of Becker Ventures. On January 28, 2009, Becker sued McInerney in Oakland County Circuit Court (Case No. 2009-097738-CK) (the "Becker Lawsuit") regarding an unrelated promissory note running in Becker's favor from McInerney. In the Becker Lawsuit, McInerney attempted to assert counterclaims based on the 15% Agreement, but the Circuit Court ruled that the counterclaims would have to be brought in a separate suit.

As a result, on August 6, 2009, McInerney separately sued Becker and Becker Ventures in Oakland County Circuit Court (Case No. 2009-102922-CK) (the "15% Lawsuit"). The 15%

Lawsuit is the lawsuit Mr. Kohut now seeks to compromise. The 15% Lawsuit seeks damages in excess of $9 million against Becker and Becker Ventures for breach of the 15% Agreement.

McInerney's initial counsel for both the Becker Lawsuit and the 15% Lawsuit was the firm of Bush Seyferth & Paige, who were employed on an hourly fee basis. In or around May 2009, McInerney could not pay the legal fees and costs arising from litigation. As a result, on May 1, 2009, McInerney executed a Secured Promissory Note and Security Agreement, under which McInerney agreed to borrow $100,000 from the Ackerman Firm to pay litigation fees and costs.

A copy of the note and security agreement is Attached as Exhibit 2.

Under the note and security agreement, the Ackerman Firm ultimately advanced costs of $96,622.73 related to the lawsuits with Becker.[2] This included payment to Bush Seyferth for unpaid legal bills for both the Becker Lawsuit and the 15% Lawsuit. On information and belief, these unpaid bills, but for being paid by the Ackerman Firm, would have represented an attorney's charging lien, running in Bush Seyferth's favor, against McInereney's eventual recovery in the 15% Lawsuit.

On January 12, 2010, the Ackerman Firm substituted in as counsel for McInerney, replacing the Bush Seyferth firm in the 15% Lawsuit. The Ackerman Firm agreed to represent McInernery on a $^1/_3$ contingency fee basis, with the $^1/_3$ calculated against any gross recovery. In addition, under the contingency fee agreement, McInernery would reimburse costs.

A copy of the contingency fee agreement is attached as Exhibit 4.

---

[2] A copy of checks and invoices associated with $94,499.04 of the fees and costs advanced by the Ackerman Firm is attached as Exhibit 3. The difference in total costs and fees stems from miscellaneous costs, such as electronic filing fees, for which no receipts or invoices now exist. A copy of Exhibit 3 was previously provided to Mr. Kohut's counsel.

Though not specifically mentioned in the contingency fee agreement, it was understood between McInerney and the Ackerman Firm that the fees and costs previously paid to the Bush Seyferth firm, by the Ackerman Firm, would be reimbursed as a cost out of any eventual recovery in the 15% Lawsuit.

During the course of the 15% Lawsuit, discovery issued by the Ackerman Firm revealed that between January and July 2010 Becker Ventures had deleted thousands of e-mails, which contained key words such as "McInerney," "cash flow," and "15 percent". These deleted e-mails, if they still existed, would prove the existence of the 15% Agreement.

Nevertheless—despite overwhelming case law that provides that destroyed evidence is presumed relevant—on January 6, 2011, the Oakland County Circuit Court granted summary disposition for Becker based on the parol evidence rule. Specifically, the court held that McInerney had no written proof of the 15% Agreement and that mere oral testimony as to the existence of the 15% Agreement was inadmissible. Afterward, on May 17, 2011, the Oakland County Circuit Court denied McInerney's motion for reconsideration. McInerney then appealed. The appeal was docketed with the Michigan Court of Appeals on June 7, 2011.

On July 12, 2011, McInerney filed for Ch. 11 bankruptcy protection. As a result, under Bankruptcy Code § 541, the 15% Lawsuit became property of the bankruptcy estate.

On November 9, 2011, this Court approved the employment of the Ackerman Firm to represent the bankruptcy estate as special counsel regarding the 15% Lawsuit on the same terms as McInerney had employed the Ackerman Firm before bankruptcy—$^{1}/_{3}$ contingency fee, plus reimbursement of costs. *See* Docket Nos. 96 and 101. As special counsel, the Ackerman Firm, among other things, filed the opening appellate brief.

The appeal remains pending with the Court of Appeals, which has not yet scheduled oral argument. In the meantime, on November 2, 2012, this Court converted McInerney's case to Ch. 7. And Mr. Kohut has been appointed the Ch. 7 Trustee.

The Ackerman Firm has approached Mr. Kohut and offered to continue working on the appeal on the same contingency-fee basis as before, with no cost to the estate unless there is a recovery in the case. Nevertheless, Mr. Kohut has instead chosen to file the settlement motion, which, among other things, seeks to compromise the 15% Lawsuit in exchange for a $250,000 payment from Becker. Upon information and belief, the settlement was reached following a single meeting between Mr. Kohut, Becker, and counsel for both.

As things stand, Mr. Kohut has not filed anything with the Court indicating that this is an asset case. Thus, there is no Ch. 7 claims bar date.

In the Ch. 11, however, claims were filed. Among these claims is Claim No. 25, filed by the Michigan Department of Treasury as a $103,202.89 administrative expense claim for taxes accrued during the Ch. 11. Moreover, the Michigan Department of Treasury filed Claim No. 26, which seeks a priority claim of $151,460.97.

These two claims alone, if allowed, would absorb any recovery under the proposed settlement, leaving unsecured creditors with no benefit from the proposed settlement. What is more, the universe of unsecured claims is large. For example, as reflected in Claim No. 28, Ackerman alone is individually owed $115,000 for an unsecured loan made to McInerney. (The loan is unrelated to the $100,000 promissory note and the Becker lawsuits.)

And Ackerman's individual claim is just part of the large unsecured creditor pool. Based on claims filed to date—excluding duplicate claims and all claims filed by Becker or entities he

controls, which are proposed to be disallowed under the settlement—the pool of unsecured claims is $1,679,705.89.

Based on the non-existent or, at best, meager dividend to unsecured creditors, Ackerman requests that the Court deny the settlement motion.

The Ackerman Firm joins in the objection to protect its right to receive full payment of its fees and costs from the settlement proceeds should the Court decide to approve the settlement.

## Argument

The proposed settlement won't actually yield $250,000 for the estate. That is because, as explained below, the Ackerman Firm has an attorney's charging lien against the $250,000, which secures the Ackerman Firm's unpaid fees and costs. The unpaid fees are equal to $^{1}/_{3}$ of the gross, $250,000 settlement amount, which would be $83,333.33; the unpaid costs, discussed earlier, total $96,622.73. Thus, out of the $250,000, the Ackerman Firm is entitled to be paid first for its fees and costs of $179,956.06, which would leave the estate with only $70,043.94. What is more, Mr. Kohut's Trustee compensation for the $250,000 settlement is $15,750, which further reduces the net to the estate to $54,293.94.

But that doesn't account for any other Ch. 7 administrative expenses, including attorney fees for Mr. Kohut's counsel. And given the fact, as explained earlier, that the Michigan Department of Treasury has filed a $103,202.89, Ch. 11 administrative expense claim and a $151,460.97, priority claim, which would collectively absorb whatever settlement money is left after paying the Ackerman Firm and Ch. 7 administrative expenses, the proposed settlement provides no return to unsecured creditors.

As a result, given the high chance for success on appeal, the settlement falls below the lowest point in the range of reasonableness, and the Court should not approve the proposed settlement.

## The Ackerman Firm has a charging lien in the proposed settlement

Mr. Kohut has not hired the Ackerman Firm to continue pursuing the 15% Lawsuit. As a result, the Ackerman Firm has an attorney's charging lien in the settlement proceeds, which must be paid first out of the settlement proceeds.

In this case, the Ackerman Firm represented the Debtor, McInerney, both before bankruptcy and again as court-appointed, special counsel in the Ch. 11. By not hiring the Ackerman Firm to represent him in the post-conversion Ch. 7, Mr. Kohut has rejected the Ackerman Firm's executory, contingency-fee contract. *See* Bankruptcy Code § 365(d)(1); *In re Ashley*, 41 B.R. 67, 70 (Bankr. E.D. Mich. 1984). This rejection relates back to the moment immediately before the filing of the bankruptcy petition. *See* Bankruptcy Code § 365(g)(1); *Ashley*, 41 B.R. at 70.

When an executory contract is rejected, the obligee—in this case, the Ackerman Firm—is entitled to a claim against the estate for a breach of contract. *See* Bankruptcy Code § 365(g)(1); *Ashley*, 41 B.R. at 71. Because the Ackerman Firm's claim arises from an attorney-client relationship, the claim is secured by an attorney's charging lien in the recovery.

Michigan has no statutory bases for the imposition of an attorney's charging lien. *Ashley*, 41 B.R. at 71. Such a lien, if it exists at all, is therefore of common-law origin. *Id.* An attorney's charging lien is an equitable right to have the fees and costs due for services in a suit secured out of the judgment or recovery in that particular suit. *Id.*

The Ackerman Firm's claim fits within the definition. Under Michigan law, no specific procedure is devised for the "perfection" of the lien. *Id.* And because there is no further act necessary to perfect the Ackerman Firm's lien, the lien is now invulnerable to attack by Mr. Kohut under either Bankruptcy Code § 544 or 547. *Id.*

It is the essence of an attorney's charging lien that the fund out of which the attorney seeks to be paid must have been secured substantially by the attorney's services rendered in creating such fund. *Id* at 72.. In this case, the Ackerman Firm prosecuted the 15% Lawsuit and the pending appeal, which Mr. Kohut now proposes to compromise. Thus, but for the Ackerman Firm's work, there would be nothing for Mr. Kohut to compromise. And it was the Ackerman Firm's services that substantially secured the proposed settlement.

Because Mr. Kohut has rejected the Ackerman Firm's employment agreement, the valuation of the Ackerman Firm's services and resulting lien is now the responsibility of this Court and will need to be determined on the basis of quantum meruit. *Id.* at 72–73.

The Ackerman Firm, as a contingency-fee firm, does not keep regular time records. Nevertheless, based on the hours worked and its regular hourly rate, the fee under a quantum meruit approach would greatly exceed the $250,000 recovery. Nevertheless, under Michigan law, the disavowed contingency-fee contract limits the quantum meruit recovery; that is, the quantum meruit recovery is capped by and may not exceed the recovery that the Ackerman Firm would have made under the contingency free agreement. *See Ruby & Assocs., P.C. v. Smith & Co., P.C.*, No. 297266, 2011 Mich. App. LEXIS 1733, at *45–46 (Mich. Ct. App. Oct. 4, 2011).

Thus, the Ackerman Firm only seeks recovery for $^1/_3$ of the gross settlement proceeds plus reimbursement of its costs, for a total of $179,956.06.

Proposed settlement falls below the lowest point in the range of reasonableness

As explained earlier, the Ackerman Firm's attorney's charging lien, combined with Mr. Kohut's trustee compensation, reduces the net value of the $250,000 settlement to the estate to $54,293.94. And that is before accounting for the administrative expenses of Mr. Kohut's counsel, and the administrative and priority claims asserted by the Michigan Department of Treasury. Thus, as things stand, none of the settlement proceeds will flow to unsecured creditors. On that basis, the settlement falls below the lowest point in the range of reasonableness, and the Court may deny approval of the proposed settlement.

The settlement of a cause of action belonging to a bankruptcy estate is governed by Bankruptcy Rule 9019. While a bankruptcy trustee has the authority to seek a settlement of claims under Rule 9019, any proposed settlement is subject to the approval of the bankruptcy court, which enjoys significant discretion. *See, e.g.*, *In re Fodale*, No. 10-69502, 2013 Bankr. LEXIS 914, at *14 (Bankr. E.D. Mich. Feb. 22, 2013) (citation omitted).

When determining whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement or merely rely upon the trustee's word that the settlement is reasonable. *Id.* at *15 (citation omitted). Rather, the bankruptcy court is charged with an affirmative obligation to appraise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. *Id.* (citation omitted).

In determining whether a proposed settlement is fair and equitable there can be no informed and independent judgment until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. *Id.* (citation omitted). Further, the judge should form an educated estimate of the

complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *Id.* at *15–16 (citation omitted). Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. *Id.* at *16 (citation omitted).

When considering a trustee's motion to compromise, the Court must consider four factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Id.* (citation omitted). The obligation of the court is to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness. *Id.* at *31 (citation omitted).

In this case, all four factors weigh against approving the settlement.

First, there is a high probability of success on appeal. The state court judge did not properly consider well-established case law, which provides that destroyed evidence is deemed relevant. In this case, the destroyed evidence would have established the 15% Agreement and McInerney's ensuing right to $9,000,000+ in damages.

Second, there should be little difficulty encountered in collection. On information and belief, Becker and Becker Ventures have significant liquid assets that would be available to satisfy the eventual judgment.

Third, while the 15% Lawsuit may, at first, appear complex, it really just boils down to whether or not the 15% Agreement exists or not. If the agreement exists, then a simple

calculation of damages will follow. There will be no great expense in pursuing the suit because the Ackerman Firm stands ready to continue working on Mr. Kohut's behalf on a contingency-fee basis. True, there will be some inconvenience and delay in waiting for the Court of Appeals to set oral argument and issue a ruling, coupled with the delay associated with remand to the trial court. But the potential delay is outweighed by the potential recovery of $9,000,000+.

Fourth, and last, the paramount interest of the creditors is only met by maximizing the potential recovery from the 15% Lawsuit and not abandoning it for a meager sum compared to the potential recovery. In addition, through this response, at least one unsecured creditor, Ackerman, has objected, and the Court should afford some deference to his reasonable view that the proposed settlement is not in the best interests of unsecured creditors.

All things considered, the proposed settlement falls below the lowest point in the range of reasonableness, and the Court may deny approval.

## Conclusion

Little if any of the proposed settlement will flow to unsecured creditors. Indeed, as things stand, the Ackerman Firm, Mr. Kohut, Mr. Kohut's counsel, and the Michigan Department of Treasury will absorb all of the $250,000. On the other hand, pursuing the lawsuit, which the Ackerman Firm stands ready to do on a contingency fee basis, will yield in excess of $9,000,000 for the estate. Viewed in that light, the proposed settlement falls below the lowest point in the range of reasonableness, and the Court may deny Mr. Kohut's settlement motion.

                              STEINBERG SHAPIRO & CLARK

                              /s/ Jordan M. Sickman (P69823)
                              Mark H. Shapiro (P43134)
                              Attorneys for Alan Ackerman and
                              Ackerman Ackerman & Dynkowski
                              25925 Telegraph Road., Suite 203
                              Southfield, MI 48033
                              Telephone: (248) 352-4700
                              shapiro@steinbergshapiro.com
                              sickman@steinbergshapiro.com

Date:       April 1, 2013