**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE:<br><br>Michael E. McInerney,<br><br>    Debtor. | Case No. 11-58953-tjt<br>Chapter 7<br>Hon. Thomas J. Tucker |

**CHAPTER 7 TRUSTEE'S REPLY BRIEF IN SUPPORT OF MOTION PURSUANT TO FED. R. BANKR. P. 9019 AUTHORIZING AND APPROVING SETTLEMENT AGREEMENT BY AND BETWEEN CHAPTER 7 TRUSTEE AND CHARLES E. BECKER, CHARLES E. BECKER, TRUSTEE UNDER TRUST AGREEMENT OF CHARLES E. BECKER DATED SEPTEMBER 16, 1997, AS AMENDED, AND BECKER VENTURES, LLC**

Gene R. Kohut, duly appointed Chapter 7 trustee ("Trustee") of the above-captioned debtor, Michael E. McInerney ("Debtor"), through counsel, Wolfson Bolton PLLC, for his Reply Brief in Support of Motion Pursuant to Fed. R. Bankr. P. 9019 Authorizing and Approving Settlement Agreement ("Motion")[1] [Docket No. 481] by and between Chapter 7 Trustee and Charles E. Becker ("C. Becker"), Charles E. Becker, Trustee under Trust Agreement of Charles E. Becker dated September 16, 1997, as amended ("Becker Trust"), and Becker Ventures, LLC ("Becker Ventures") (C. Becker, Becker Trust, and Becker Ventures are individually and collectively referred to as "Becker") states:

**I.      INTRODUCTION**

The Trustee seeks to settle, for $250,000, Debtor's pre-petition lawsuit related to an alleged oral contract to receive 15% of the "free cash flow" from Becker Ventures.  Four objections have been filed to the Trustee's Motion.  The first objection, filed by the Debtor [Docket No. 491], is a regurgitation of Debtor's appellate brief and simply alleges that the Litigation has a high probability of success to recover an unsubstantiated sum of money.  The second objection, filed by Alan Ackerman and Ackerman Ackerman & Dynkowski (collectively,

---
[1] Capitalized terms used but not defined in this Reply Brief have the meanings given them in the Motion.

"Ackerman") [Docket No. 492], the firm who formerly represented Debtor in the Litigation and who is purportedly out-of-pocket in excess of $96,000 under its contingency fee agreement, alleges that the settlement recovery will provide little return to unsecured creditors due to the purported lien of Ackerman on the settlement proceeds. However, as explained below, the Ackerman lien is not enforceable. Concurrences in Debtor's objection were filed by Debtor's self-described "friend," Michael J. Stechschulte [Docket No. 500] and Debtor's brother, Mark W. McInerney [Docket No. 506].[2] Stechschulte and Mark McInerney concur in Debtor's objection and do not raise additional grounds to oppose the Motion. For the reasons set forth below, and those contained in the Motion, the Trustee requests that the Court overrule all objections and grant the Motion.

## II. STATEMENT OF FACTS

The Trustee incorporates by reference the facts recited in the Motion and those contained in the appellate briefs attached as exhibits to the Motion.

## III. ARGUMENT

### A. Legal Standard

While Fed. R. Bankr. P. 9019 offers no guidance as to the criteria to be used in evaluating whether a settlement should be approved, courts "uniformly have drawn from the language of the Supreme Court's decision in *TMT Trailer Ferry* in establishing a 'fair and equitable' threshold for settlement approval." *In re Anderson*, 377 B.R. 865, 870 (B.A.P. 6th Cir. 2007); *Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) ("The requirements . . . that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations."). Compromises expedite the administration of the case, reduce administrative costs, and are favored in bankruptcy. *See Protective Comm. of Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Courts in the Sixth Circuit have noted that "[s]ettlements in bankruptcy cases are

---

[2] Mark McInerney's objection was not timely filed.

favored by law." *Buckeye Check Cashing, Inc. v. Meadows*, 396 B.R. 485, 499 (6th Cir. (BAP) 2008) (*citing In re Cormier*, 382 B.R. 377, 400–01 (Bankr. W.D. Mich. 2008)).

Indeed, the "very purpose of . . . a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *In re MQVP, Inc.*, 477 Fed. Appx. 310, 312 (6th Cir. 2012) (internal quotations omitted). In furtherance of this principle, the Sixth Circuit Court of Appeals has acknowledged that "bankruptcy courts and district courts in this jurisdiction generally accord some deference to the trustee's decision to settle a claim." *Id. at* 313. Courts in this jurisdiction have recognized that, in approving a settlement, "the obligation of the court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (internal quotations omitted).

When approving a settlement, the Court "need not hold a mini-trial or write an extensive opinion . . . [t]he judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision." *In re MQVP, Inc.*, 477 Fed. Appx. at 313.

### B. None of the Objections Provide a Basis to Deny the Motion.

#### i. Debtor's and Stechschulte's Objections

There are three primary oversights in Debtor's objection: (1) Debtor overstates the probability of success on merits; (2) Debtor overstates the remaining work to be done before any potential recovery could be had from his alleged oral contract; and (3) Debtor has provided no factual support to support his calculation of damages.

##### a. Probability of Success in the Litigation

Debtor's objection focuses on the purported destruction of electronic records that would allegedly support his oral agreement, but gives short shrift to the merger/integration clause argument that may preclude the existence of his alleged oral agreement. If Becker were to

{00010836.DOCX 2} 3

11-58953-tjt    Doc 507    Filed 04/08/13    Entered 04/08/13 14:24:03    Page 3 of 14

succeed on his merger/integration clause argument, the existence of electronic records would be irrelevant because the oral agreement would be barred.

Attached as Exhibit 6i are copies of the First Amended and Restated Operating Agreement for Becker Ventures and the First Amendment to Amended and Restated Operating Agreement of Becker Ventures. Debtor contends that the Operating Agreements of Becker Ventures do not foreclose his alleged oral agreement to receive 15% of the "free cash flow" from Becker Ventures. Debtor's Objection, pp. 5-6. However, a plain reading of the Operating Agreement suggests otherwise.

Debtor was a member in Becker Ventures under the First Amended Operating Agreement. *See* Exhibit 6i, p. 1. Section 8.15 of the First Amended Operating Agreement contains a merger/integration clause that states in pertinent part: "This Agreement constitutes the entire agreement of the Company and the Members and this Agreement supersedes all prior conversations or writings which are merged herein and extinguished." Exhibit 6i, p. 32.

Subsequently, Debtor and Becker entered into the First Amendment to First Amended Operating Agreement in January 2001. Debtor's membership in Becker Ventures changed from an equity membership to a non-equity membership. Exhibit 6i. In addition, Article IV of the First Amended Operating Agreement was amended and restated in its entirety to address Debtor's position as a non-equity member. Exhibit 6i. The new Article IV does not eliminate the merger/integration clause of Section 8.15. Further, Paragraph 4 of the First Amendment to First Amended Operating Agreement states that "[a]ll of the remaining provisions of the Operating Agreement shall remain in full force and effect." Accordingly, the merger/integration clause survived the First Amendment to First Amended Operating Agreement.

Debtor takes the position that the oral agreement to receive 15% of the free cash flow from Becker Ventures "was meant to replace the LLC operating agreement as the vehicle by which the parties would jointly invest in real estate." Exhibit 6e, p. 29. Debtor further argues that the language of the First Amendment to First Amended Operating Agreement excises all

applicable provisions of the First Amended Operating Agreement as to Debtor except three: Section 3.12, 8.2, and 8.7. Debtor's objection, p. 6. Debtor argues that the three clauses were retained "due to McInerney's continuance as a *salaried manager*" of Becker Ventures. Exhibit 6e, p. 29 (emphasis in original).

There are numerous flaws in Debtor's reasoning. The first is that Debtor indicated during discovery in the Lawsuit that his alleged oral agreement was finalized in 1999 – before the First Amendment to First Amended Operating Agreement was executed. *See* Exhibit 6j, Debtor's Response to Defendants' Interrogatories, No. 2. It is illogical to assume that Debtor would amend the Becker Ventures operating agreement to safeguard his salary from Becker Ventures (while relinquishing his equity membership) but not memorialize the alleged oral 15% agreement in 2001. Moreover, the fact that the First Amendment to First Amended Operating Agreement purportedly contemplates payment of a salary to Debtor from Becker Ventures but does not provide for payment of the alleged 15% free cash flow is telling.

Second, the merger/integration clause survived the First Amendment to First Amended Operating Agreement. Accordingly, oral agreements, such as Debtor's alleged agreement, were extinguished when the First Amendment to First Amended Operating Agreement was executed.

Lastly, Debtor's argument that the First Amendment to First Amended Operating Agreement excises all applicable provisions of the First Amended Operating Agreement except Section 3.12, 8.2, and 8.7 violates principles of contract construction. If Debtor were correct that the First Amendment to First Amended Operating excises all provisions of the First Amended Operating Agreement except for Section 3.12, 8.2, and 8.7, it would render Paragraph 4 of the First Amendment to First Amended Operating – reaffirming that all of the provisions of the First Amended Operating Agreement remain in effect – meaningless. However, courts must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group*

*Agency, Inc.*, 468 Mich. 459, 468 (2003). Accordingly, the Trustee does not believe that the Lawsuit has a high probability of success on the merits.

Furthermore, assuming that the Debtor is correct – and the alleged oral agreement is not barred by the parol evidence rule - the Trustee believes that the decision to settle the Lawsuit is reasonable, and certainly does not fall below the lowest point in the range of reasonableness. Given the arguments on both sides of this issue and the procedural posture of the Lawsuit (summary disposition was entered against Debtor in the Circuit Court), the Trustee believes that a settlement now versus the possibility of losing on appeal is in the best interests of Debtor, Debtor's estate, and creditors of Debtor's estate.

### b. Complexity, Expense, Inconvenience, and Delay of the Litigation.

Debtor flippantly maintains that *if* the Trustee were to succeed on appeal,[3] "only trial remains to be conducted." Objection, p. 8. Given the procedural posture of the Litigation, trial would prove to be complex, expensive, inconvenient, and time-consuming.

First, to even return to the Circuit Court, the Trustee must successfully argue that the parol evidence rule does not bar Debtor's alleged 15% oral agreement and that evidence of the alleged oral agreement was purposefully destroyed by Becker. Next, the Trustee must defeat Becker's cross-appeal, which alleges alternative grounds to affirm judgment in favor of Becker – that Debtor's complaint is barred under the contractual limitations period as provided in the Becker Ventures Operating Agreement and that Debtor's complaint is barred by an agreement to arbitrate. *See* Exhibit 6g.

Assuming that the Trustee overcomes these hurdles, the Trustee must then litigate the case in Circuit Court – all at substantial time, expense, and cost to the estate. While the Trustee is not able to predict the course that trial may take, it is likely that trial would prove time-

---

[3] Per the Michigan Court of Appeals 2012 Annual Report, 72.3% of all cases decided by the Michigan Court of Appeals in 2012 affirmed the lower court ruling. *See* http://courts.mi.gov/Courts/COA/aboutthecourt/Documents/Annual%20Report%202012.pdf, p. 4.

{00010836.DOCX 2}　　　　　　　　　　　　　6

consuming, expensive, and complex. Among the complexities, and as further discussed below, is the issue of damages. Debtor boldly asserts that recovery at trial would be $14.5 million, while Debtor's former appellate counsel, Ackerman, alleges that damages would exceed $9 million. Debtor's objection, p. 1; Ackerman objection, p. 3. However, neither of these numbers is substantiated, and the Trustee would be left with the burden of proof on this issue at trial.

### c. Damages Are Speculative

Debtor's has repeatedly claimed damages of $14.5 million, but has provided no substantiation for that figure. Debtor's prior appellate counsel estimates a completely different number - $9 million – but similarly provides no substantiation for its guess.

In 2009, when asked how the 15% free cash flow was calculated, Debtor responded in part:

> Mr. McInerney calculated approximate positive cash flows for each of the properties listed in his complaint using the limited financial information that was available to him. The financial records necessary to accurately calculate the positive cash flow for each of the properties at issue are in Defendants' possession.

*See* Exhibit 6j, Response to Interrogatory No. 19. When asked about the calculation of the 15% free cash flow in 2012, Debtor indicated that he "approximated the cashflow on the various investments that are part of the deal" and that documents produced during litigation purportedly confirmed his "extensive series of calculations." *See* Exhibit 6h, pp. 45-7. Despite these self-serving contentions and numerous conversations with both Debtor and Ackerman regarding the intricacies of the Litigation, the Trustee has been provided no documentary evidence substantiating the $14.5 million damage calculation.

This factor contributed to the Trustee's decision to compromise the Litigation. Absent any clear cut calculation of damages the Trustee can rely upon to carry the burden of proof at trial, the Trustee has concluded that settlement of the Litigation is in the best interests of Debtor, Debtor's estate, and creditors of Debtor's estate.

### ii. Ackerman's Objection

Ackerman's objection should be viewed through the lens of its author – an attorney engaged on a contingency fee basis who claims to be out-of-pocket in excess of $96,000. As a result, the partiality of Ackerman and ability to evaluate the proposed settlement from the vantage point of all creditors is questionable. Moreover, the crucial flaw in Ackerman's argument is that Ackerman does not hold an enforceable attorneys' charging lien. And, even if Ackerman's attorneys' charging lien is enforceable, Ackerman has included non-recoverable costs and miscalculated the 1/3 contingency recovery.

#### a. Background Regarding Ackerman Retention

An Order Conditionally Granting Debtor's Motion for Order Authorizing Employment of Ackerman as Special Counsel for Debtor [Docket No. 96] was entered on November 9, 2011. That Order provided that, to the extent Debtor sought to employ Ackerman as special counsel, the engagement would be pursuant to the contingency fee agreement attached as Exhibit 1 to Docket No. 87. On November 11, 2011, Debtor and Ackerman filed a Stipulation [Docket No. 101] indicating that Ackerman's retention would be pursuant to the pre-petition contingency arrangement, and that Ackerman would not be paid any fee on an hourly basis.

Debtor's Chapter 11 case was converted to Chapter 7 on November 2, 2012. The Trustee did not assume the Ackerman contingency fee agreement. Therefore, the Ackerman contingency fee agreement was rejected under 11 U.S.C. § 365(d)(1), and Ackerman has a claim for pre-petition breach of contract. 11 U.S.C. § 365(g)(1).

#### b. Ackerman Does Not Have An Enforceable Lien on the Settlement Proceeds

Ackerman presents two arguments to substantiate his purported lien on the settlement proceeds: (1) that Debtor executed a Security Agreement; and (2) that Ackerman has a common law attorneys' charging lien. Both arguments fail.

First, the Security Agreement attached as Exhibit 2 to Ackerman's objection purports to grant Ackerman a security interest in:

> (a) any and all rights of recovery, net of any and all obligations, of Borrower in connection with the litigation matters currently pending in Oakland County Circuit Court entitled 'Charles E. Becker v. Michael E. McInerney' and 'Becker Ventures LLC v. MEM Investments LLC', and any other litigation matters arising out of or in connection with the claims and counterclaims of the parties encompassed by such litigation matters.

Ackerman objection, Exhibit 2. It appears that Debtor intended to grant Ackerman a security interest in a commercial tort claim or general intangible (as those terms are defined in the Uniform Commercial Code).

There are at least two problems with Ackerman's purported security interest. First, the description of the collateral granted to Ackerman does not include the Litigation. Second, even assuming that the collateral description included the Litigation, the only way to perfect a security interest in commercial tort claims and general intangibles is by filing a UCC financing statement. *See* MCL § 440.9301 *et seq.* Ackerman did not file a UCC financing statement. Therefore, Ackerman's claimed security interest, if properly taken, would be unperfected and avoidable by the Trustee.

Next, Ackerman does not have a valid attorneys' charging lien. Due to the rejection of the contingency fee agreement, Ackerman's claim for breach of contract arises pre-petition. 11 U.S.C. § 365(g)(1). At that time, there was no fund for Ackerman to assert a lien against.

Moreover, the case that Ackerman relies upon to support his purported attorneys' charging lien, *In re Ashley*, 41 B.R. 67 (Bankr. E.D. Mich. 1984), does not support Ackerman's argument. In *In re Ashley,* the Court held that "[i]t is the essence of an attorney's charging lien, that the fund out of which the attorney seeks to be paid must have been secured substantially by the attorney's services rendered in creating such fund." *Id.* at 72 (internal quotations omitted). Ackerman never generated a fund to recover against. Indeed, summary disposition

was entered **against** Ackerman's client, and Debtor appealed the adverse ruling. The fund in this case was generated solely from the efforts of the Trustee. Therefore, because Ackerman did not generate the fund out of which he seeks to recover, he does not have an enforceable attorney's charging lien against the fund (the settlement proceeds).

Michigan law suggests that in circumstances such as these, Ackerman may be entitled to recovery in *quantum meruit,* but not a contingency fee recovery. *Ambrose v. Detroit Edison Co.*, 65 Mich. App. 484, 491 (1975) ("an attorney on a contingent fee arrangement who is wrongfully discharged, or who rightfully withdraws, is entitled to compensation for the reasonable value of his services based upon quantum meruit, and not the contingent fee contract."). The conditions precedent to receipt of a *quantum meruit* recovery under *Ambrose* have not been met here because Ackerman was not wrongfully discharge, nor did Ackerman rightfully withdraw. Furthermore, the Trustee reserves the right to challenge any *quantum meruit* recovery alleged by Ackerman, especially given that Ackerman has admitted that he has not kept time records with respect to his representation of Debtor. Ackerman objection, Exhibit 1, ¶¶ 45-6.

        c.        **Even If Ackerman's Attorneys' Charging Lien is Enforceable, the Costs Requested Are Not Reasonable.[4]**

In support of his purported attorneys' charging lien, Ackerman alleges to have incurred $96,622.73 in costs. Ackerman objection, p. 3. Of that amount, Ackerman's Exhibit 3 accounts for only $94,499.04. *See* Ackerman objection, Exhibit 3. However, a majority of these costs are not reimbursable.

---

[4] In addition to unreasonable costs, it appears that Ackerman may be calculating his purported charging lien incorrectly. Ackerman is first subtracting his claimed 1/3 contingency ($83,000) and then deducting costs of $96,622.73. *See* Ackerman objection, p. 6. This approach is contrary to normal contingency fee recovery where expenses are deducted, then the contingency fee recovery is calculated on the remainder. Ackerman's approach would yield an absurd result because it is mathematically possible under Ackerman's approach that a contingency fee recovery could entirely eclipse expenses and leave no recovery for the client. Example: $100,000 recovery and $70,000 in costs. If using Ackerman's approach, the contingency would first be deducted ($33,333.33) and then expenses would be deducted. However, the fund is not large enough to repay expenses or generate any recovery to the client.

Of the claimed $96,622.73, $60,179.79 relates to payments by Ackerman to Bush Seyferth & Paige, PLLC – Ackerman's former co-counsel in the Litigation. In an attempt to substantiate why these payments would be recoverable as part of Ackerman's purported attorneys' charging lien, Ackerman states "[t]hough not specifically mentioned in the contingency fee agreement, it was understood between McInerney and the Ackerman Firm that the fees and costs previously paid to the Bush Seyferth firm, by the Ackerman Firm, would be reimbursed as a cost out of any eventual recovery in the 15% Lawsuit." Ackerman objection, p. 4.

Though the contingency fee agreement attached as Exhibit 4 to Ackerman's objection is not dated, Ackerman's affidavit suggests that the contingency fee agreement was executed on January 12, 2010. Ackerman objection, Exhibit 1, ¶¶ 10-11. Therefore, at the time that the contingency fee agreement was signed, the Bush Seyferth fees had already been paid by Ackerman, and the parties did not include those fees in the contingency fee agreement. The language of the Ackerman objection suggests the same. See Ackerman objection p. 4 ("the fees and costs **previously paid** to the Bush Seyferth firm . . . .") (emphasis added). Ackerman's belated attempt to relay the parties' "understanding" contradicts the signed contract. Moreover, even if the parties had intended to include the Bush Seyferth fees, there is no basis to include those fees as a cost of litigation attributable to Ackerman's purported lien. If the Bush Seyferth fees were unpaid, then the firm would have a pre-petition claim against Debtor.

In fact, Ackerman's prior testimony contradicts his assertion regarding the "understanding" of Debtor and Ackerman. See Exhibit 6k, December 14, 2011 transcript of Ackerman, pp. 112-6. When asked why Ackerman would pay the Bush Seyferth bills, Ackerman gave the following responses:

> "Because I told Mike [Debtor] that I would spend $100,000 on the case. And the bills were there and we paid them – he paid them."

> "Because I'm a really important person. Because I'm really vain. And because I'm stupid. Because I had just gotten a huge, you

> know, $17 million settlement and screwing around with case [*sic*] like this was fun.
>
> When you go back and schlep like the last few years have been, you know, you just make a nice living, it's really – it's something I wouldn't do today but I did then because I had money in my pocket."

Exhibit 6k, pp. 113-5. Based on Ackerman's own testimony, the payment of Bush Seyferth fees on behalf of Debtor appears to have been gratuitous, and Ackerman's inclusion of the Bush Seyferth fees is an improper attempt to roll up these monies under his purported secured attorneys' charging lien.

Lastly, scant detail regarding the services provided by Techmotives Consulting Corp. in exchange for payment of approximately $28,000 by Ackerman has been provided. The Trustee objects to these costs as unreasonable.

### iii. Mark McInerney's Objection

Mark McInerney's objection [Docket No. 506] was filed on April 8, 2013 (signed on April 5, 2013). Under Fed. R. Bankr. P. 2002(a)(3) and 9006(f), Mark McInerney's objection was due on April 4, 2013. Therefore, Mark McInerney's objection is untimely and the Trustee requests that it be overruled. Moreover, Mark McInerney's objection merely alleges that the settlement is "extremely modest" and that the Litigation has a "strong chance" of success – arguments that mirror those of Debtor and Ackerman. For the reasons set forth above, that argument fails.

## IV. CONCLUSION

Neither Debtor, Ackerman, Stechschulte, nor Mark McInerney provide any legitimate basis suggesting that this settlement falls below the lowest point in the range of reasonableness. The proposed settlement would allow the Trustee to resolve sharply contested and somewhat dubious claims. Debtor's objection grossly overstates the Trustee's chances of success on the merits and provides no basis to adopt Debtor's calculation of damages. Ackerman's objection similarly provides no basis to adopt Ackerman's calculation of damages. Additionally, Ackerman's objection is premised upon a purported attorneys' charging lien that is

not enforceable.  Mark McInerney's objection is untimely and raises no additional grounds to oppose the Motion.  Accordingly, for the reasons set forth above and those contained in the Motion, the Trustee requests that the Court overrule Debtor's, Ackerman's, Stechschulte's, and Mark McInerney's objections and grant the Motion.

                                        Respectfully submitted,

                                        WOLFSON BOLTON PLLC

Dated:  April 8, 2013                   By:      /s/ Anthony J. Kochis
                                                   Scott A. Wolfson (P53194)
                                                   Anthony J. Kochis (P72020)
                                        3150 Livernois, Suite 275
                                        Troy, MI  48083
                                        Telephone:  (248) 247-7105
                                        Facsimile:  (248) 247-7099
                                        E-Mail:  akochis@wolfsonbolton.com

# **EXHIBIT INDEX**

| EXHIBIT 6i | First Amended and Restated Operating Agreement for Becker Ventures and the First Amendment to Amended and Restated Operating Agreement of Becker Ventures |
|---|---|
| EXHIBIT 6j | Debtor's Response to Defendants' Interrogatories |
| EXHIBIT 6k | December 14, 2011 transcript of Ackerman |