UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                          Case No. 11-58953

MICHAEL E. McINERNEY,                                           Chapter 7

          Debtor.                                               Judge Thomas J. Tucker
_____ /

**OPINION REGARDING THE CHAPTER 7 TRUSTEE'S MOTION
FOR APPROVAL OF SETTLEMENT**

This case is before the Court on the Chapter 7 Trustee's motion entitled "Chapter 7
Trustee's Motion Pursuant to Fed. R. Bankr. P. 9019 Authorizing and Approving Settlement
Agreement by and Between Chapter 7 Trustee and Charles E. Becker, Charles E. Becker, Trustee
under Trust Agreement of Charles E. Becker Dated September 16, 1997, as Amended, and
Becker Ventures, LLC [(collectively the 'Becker parties')]."[1]  The Motion seeks to compromise,
for $250,000.00, claims that Debtor asserted against Charles E. Becker and Becker Ventures,
LLC in a lawsuit Debtor filed prepetition, seeking in excess of $9 million in damages.  The
Debtor and certain creditors object to the Motion.  For the reasons stated in this opinion, the
Court will deny the Motion.

**I.  Background**

    **A.  The prepetition state court litigation**

On August 6, 2009, Debtor Michael E. McInerney ("Debtor") filed a lawsuit against
Charles E. Becker ("Becker") and Becker Ventures, LLC ("Becker Ventures") (collectively, the
"Defendants" or "Becker Defendants") in the Oakland County, Michigan, Circuit Court (Case
No. 09-102922-CK), seeking damages in excess of $9 million**,** based on claims of (1) breach of

_____
[1] Docket # 481 (the "Motion").

contract; (2) breach of fiduciary duty; (3) unjust enrichment; and (4) promissory estoppel.  The

lawsuit arose out of two written agreements and an alleged oral agreement entered into between

Debtor, Becker, and Becker Ventures, which are briefly summarized below.[2]

### 1.  The agreements

In 1998, Debtor and Becker formed Becker Ventures, in which they were the sole

members, and executed an operating agreement.  Under the 1998 operating agreement, Debtor

was to own 20% of Becker Ventures.  Debtor was the Manager, President, and CEO of Becker

Ventures, and managed that entity's daily business operations.  The 1998 operating agreement

provided that "no change hereto shall be valid unless executed in writing and signed by the party

to be charged therewith."

In January 1999, Debtor and Becker executed the "First Amended and Restated Operating

Agreement for Becker Ventures, LLC" (referred to below as the "Operating Agreement" or the

"1999 Operating Agreement").  The Operating Agreement provided, in Section 3.19, that

Managers of Becker Ventures "shall be entitled to compensation for [their] services in managing

the affairs of the Company," and that such compensation was to be "reasonable and consistent

with competitive industry practices in the area in which the Company conducts its business." (the

"compensation provision").[3]  While this compensation provision of the Operating Agreement did

---

[2] Except as otherwise noted, the facts recited in Sections I.A.1 though I.A.3 of the Court's
opinion are taken from the state court's "Opinion and Order," dated January 6, 2011, granting the
Defendants' motion for summary disposition, and the "Opinion and Order" dated May 17, 2011, denying
Plaintiff's motion for reconsideration of the January 6, 2011 Opinion and Order.  These are attached as
Exhibits 6b and 6c to the Motion (Docket # 481).  In this opinion, the Court provides a brief recitation of
only those motions and proceedings in the state court lawsuit that are relevant to the issues presented by
the Motion.  (There were many more motions, hearings, and rulings in the state court lawsuit.)

[3] Operating Agreement at 8-9 (Docket # 507, Ex. 6i).

not specify the exact compensation Managers were to receive, the Debtor was paid an annual salary of $300,000 for managing Becker Ventures.

The Operating Agreement contained an integration clause, Section 8.15, which stated that it was "the entire agreement of the Company and the Members" and that it "supersed[ed] all prior conversations or writings which are merged herein and extinguished."[4] The Operating Agreement also contained a non-modification clause, Section 8.21, which stated that the Operating Agreement "may be amended or modified from time to time only by a written instrument voted favorably upon and adopted by Members holding a majority of the Membership Interests of the Company."[5]

The Operating Agreement also contained an arbitration clause, which required the parties to submit disputes to binding arbitration, and set a time limit for doing so.[6]

In 1999, Becker transferred a substantial amount of his personal assets to Becker Ventures, to be managed by that company. Because of this, Debtor and Becker agreed that Debtor's 20% interest in Becker Ventures would be reduced to a 1% interest in that entity. That change is reflected in Schedule A of the 1999 Operating Agreement.

Debtor alleged in the state court lawsuit, but Becker disputed, that as consideration for Debtor's relinquishment of the 19% interest in Becker Ventures, Debtor and Becker orally agreed that Debtor "would receive 15% of the 'free cash flow' derived from '10 specific investments' that Becker Ventures would make" (the "15% Oral Agreement" or the "15% Agreement").

---

[4] *Id*. at 32, § 8.15.

[5] *Id*. at 33, § 8.21.

[6] *Id*. at 26-27, § 7.1, 7.1.1.

3

Debtor alleged that under this oral agreement, "free cash flow" meant "revenues, less operating expenses, less interest, less principal debt service, plus sale proceeds, less principal debt balance, less equity investment."

In 2001, Debtor and Becker executed an amendment to the Operating Agreement (the "2001 Amendment"), which is discussed in more detail in part III.C.1.a.i of this opinion.[7]  As part of the 2001 Amendment, Debtor became a "Non-Equity Member" and relinquished his remaining 1% interest in Becker Ventures.

Debtor continued to manage Becker until 2008.  Debtor alleged in the state court lawsuit that between 1999 and 2009, the "free cash flow," within the meaning of the 15% Oral Agreement, was $93 million, and that he was not paid the amounts owed to him under the 15% Oral Agreement.  Also in the state court lawsuit, Debtor alleged that the Becker Defendants had destroyed emails on their computers, which Debtor had requested in discovery.  Based on Defendants' alleged destruction of this evidence, Debtor filed a motion for entry of default as a sanction, or alternatively, for an evidentiary hearing to determine what information was contained in the emails, and whether the destruction was intentional (the "Spoilation Motion").  Ultimately, the state court denied the Spoilation Motion in its entirety, for reasons discussed in part III.C.1.b.1 of this opinion.

**2. The trial court's summary disposition on Debtor's claims, in favor of Defendants.**

In August 2010, the Becker Defendants filed a motion for summary disposition under Mich. Ct. R. 2.116(C)(10), the state court equivalent of a federal court motion for summary

---

[7] A copy of the 2001 Amendment is contained in Ex. 6i to Docket # 507.

judgment.[8]  On January 6, 2011, the state court entered an Opinion and Order granting summary disposition for the Becker Defendants on all of Debtor's claims.[9]  The state court held that: (1) the compensation owed to Debtor as a manager of Becker Ventures was governed by the compensation provision of the 1999 Operating Agreement; (2) the Operating Agreement was "fully integrated" and did not include the requirement that Debtor be paid any specific amount of compensation; (3) the parol evidence rule barred the introduction of any evidence regarding the alleged 15% Oral Agreement; and (4) "sanctions related to the alleged destruction of emails on [D]efendant's computer is inappropriate because [Debtor] failed to establish conclusively that [D]efendant destroyed any material evidence (emails) that would be relevant in establishing [his] claim that an oral agreement existed between the parties."

> **3. Debtor's motion for reconsideration of the state court's January 6 Opinion and Order.**

Debtor moved for reconsideration of the state court's January 6 Opinion and Order.  The state court held a hearing, and on May 17, 2011, filed an Opinion and Order denying the Debtor's motion for reconsideration.[10]

---

[8]  This was the Defendants' second such motion.  The state court had denied Defendants' first motion for summary disposition on June 23, 2010, and denied reconsideration of that ruling on January 5, 2011.  The first motion for summary disposition argued that Debtor's claims were subject to binding arbitration, and that the claims were time barred under Section 7.1.1 of the Operating Agreement, because Debtor had not "submitted" his claims to the Company "within thirty [30] days of the occurrence of any Dispute."  The state court found that Defendants had waived these defenses, and denied Defendants' motion.

[9]  Ex. 6b of Docket # 481 ("Opinion and Order" dated January 6, 2011 ("January 6 Opinion and Order").  The January 6 Opinion and Order was reissued on February 16, 2011 to allow the parties to timely file a motion for reconsideration, because no party had received a copy of the January 6 Opinion and Order, due to a problem with the state court's electronic filing system.

[10]  Ex. 6c of Docket # 481 ("Opinion and Order" dated May 17, 2011 ("May 17 Opinion and Order")).

5

**4. Becker Defendants' post judgment motion in the trial court for a declaration that Debtor's lawsuit was frivolous and for attorney's fees**

On June 15, 2011, Defendants filed a motion in the state court entitled "Motion for an Order Declaring Plaintiff's Action as Frivolous and Request for an Evidentiary Hearing for the Recovery of Their Attorney Fees Under [Mich. Ct. R.] 2.625(A)(2)."[11]  On June 29, 2011, after a hearing, the state court entered an order denying that motion (the "June 29 Order").[12]

**5. The state court appeals**

Debtor appealed the state court's grant of the Defendants' motion for summary disposition to the Michigan Court of Appeals.  That appeal remains pending.  In his appeal briefs, Debtor has argued, in relevant part, that the state trial court erred (1) in failing to rule that Defendants' destruction of evidence gives rise to a presumption that the spoliated evidence is relevant and adverse to the spoliator's position; (2) in failing to rule that there was a genuine issue of material fact regarding whether the 15% Oral Agreement existed; and (3) in concluding that the parol evidence rule barred extrinsic evidence to support Debtor's claim.  Debtor argued that for several reasons, the parol evidence rule did not bar his claim, including the argument that because the 15% Oral Agreement was made after the 1999 Operating Agreement, it was a subsequent, separate agreement not subject to the parol evidence rule.[13]

The Becker Defendants filed a cross appeal, arguing, in relevant part, that the state trial

---

[11] *See* Ex. 6g of Docket # 481 ("Defendants'/Appellants' Brief on Appeal for Docket No. 305141") at 25.

[12] Ex. 6e of Docket # 481.

[13] *See* "Plaintiff-Appellant's Brief on Appeal" filed in Michigan Court of Appeals Docket # 304411), which is attached to the Motion as Exhibit 6e.  (There are two exhibits marked "Exhibit 6e" attached to the Motion.  "Plaintiff-Appellant's Brief on Appeal" is the second one attached to link 9.)

court erred (1) in denying Defendants' first motion for summary disposition, because Debtor had failed to timely submit his claims to binding arbitration, as required by the 1999 Operating Agreement's arbitration clause; and (2) failing to allow Defendants to amend their affirmative defenses to explicitly add the arbitration clause as a defense.[14]  Defendants made these cross appeal arguments as alternative grounds for affirmance of the state trial court's grant of summary disposition against Debtor.

Defendants also filed a separate appeal of the state trial court's June 29 Order denying Defendants' motion for sanctions, based on Debtor's alleged filing of a frivolous lawsuit.[15]

The Michigan Court of Appeals consolidated the appeals, and they remain pending.  Oral argument has been delayed at the Trustee's request, pending the outcome of the Trustee's Motion.

### B.  The bankruptcy case

On July 12, 2011, Debtor filed a voluntary petition for relief under Chapter 11, commencing this case.  On November 2, 2012, the Court converted the case to Chapter 7.[16]  On

---

[14]  *See* "Defendants'/Cross-Appellants' Brief on Appeal for Docket No. 304411," a copy of which is attached as Exhibit 3 of Docket # 513 in this bankruptcy case.

[15]  Michigan Court of Appeals Docket # 305141.

[16]  Docket ## 413 (filed November 2, 2012), 414 (filed on November 3, 2012 to make a minor correction, not relevant here, to the order converting the case entered on November 2, 2012)(collectively, the "Conversion Order").

Debtor filed a motion for reconsideration of the Conversion Order, or alternatively, for a stay of the Conversion Order pending appeal (Docket # 418), which the Court denied on November 16, 2012 (Docket # 420, the "November 16, 2012 Order").  Debtor then appealed the November 16, 2012 Order to the district court (Docket 428).  Debtor then filed a motion seeking to stay all further proceedings in this Chapter 7 case pending the outcome of his appeal (Docket # 430).  The Court denied that motion on January 30, 2013 (Docket ## 455, 456).  Most recently, the district court dismissed Debtor's appeal, on July 31, 2013.  (*See* Docket # 538).

7

March 11, 2013, the Chapter 7 Trustee filed the Motion, seeking approval of a "Settlement Agreement and Release" (the "Settlement Agreement"), between the Trustee and the Becker parties, of the claims Debtor asserted in the state court litigation, for $250,000.00.[17]

Debtor and creditors Alan Ackerman ("A. Ackerman")[18] and Ackerman Ackerman & Dynkowski (the "Ackerman Firm")[19] (collectively, "Ackerman") filed objections to the Motion.[20] Creditors Michael J. Stechschulte and Mark W. McInerney (Debtor's brother) filed concurrences with Debtor's objection.[21]

On April 10, 2013, the Court held a hearing on the Motion, then entered an order requiring the Trustee to file a supplement to his Motion, "consisting of a copy of the docket and all briefs filed in the Michigan Court of Appeals."[22]  On April 11, 2013, the Trustee filed the required supplement,[23] and the Motion is ready for decision.

---

[17] A copy of the Settlement Agreement is attached to the Motion as Exhibit 6a.

[18] A. Ackerman is an unsecured creditor.  He filed a proof of an unsecured claim in the amount of $115,000, based on loans he made to Debtor prepetition.  (*See* Proof of Claim Nos. 18, 28).  Debtor listed A. Ackerman on Schedule F, as an unsecured creditor with a claim in the amount of $90,000.00.

[19] The Ackerman Firm is a secured creditor based on various prepetition loans it made to Debtor, which are evidenced by promissory notes and security agreements (*see* Proof of Claim Nos. 17, 29, 30), and based on an attorney's charging lien for legal services it performed for Debtor.  Prepetition, on January 12, 2010, the Ackerman Firm replaced the law firm that had previously been representing Debtor in the state court litigation.  Postpetition, the Ackerman Firm also prosecuted the state court litigation, after the Court conditionally approved its employment as special counsel for the Debtor in Possession, on November 9, 2011, on a one third contingency fee basis.  (*See* Docket ## 65, 96). After the case was converted to Chapter 7, the Chapter 7 Trustee purported to reject the contingency fee agreement.

[20] Docket ## 491, 492.

[21] Docket ## 500, 506.

[22] Docket # 510 (footnote omitted).

[23] Docket # 513.

8

## II. Jurisdiction

This Court has subject matter jurisdiction over the case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and (b)(1), and Local Rule 83.50(a) (E.D. Mich.). A motion to approve a settlement agreement is a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A) and (0). *See In re High Tech Packaging, Inc.*, 397 B.R. 369, 371 (Bankr. N.D. Ohio 2008); *In re Parkview Hosp.–Osteopathic Med. Ctr.,* 211 B.R. 603, 607 (Bankr. N.D. Ohio 1997); *In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996); *In re Frye*, 216 B.R. 166, 170 (Bankr. E.D. Va. 1997).

This contested matter also is "core" because it falls within the definition of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This matter is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Id.*

## III. Discussion

### A. Standards for approval or disapproval of a settlement agreement

"Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *HSBC Bank USA, N.A. v. Fane* (*In re MF Global Inc.*), 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (citing *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996)); *see also Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (citation omitted) (Bankruptcy Act) ("Compromises are 'a normal part of the

process of reorganization.'  In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."); *In re Dewey & LeBoeuf LLP,* 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012)(citing *MF Global Inc.*, 466 B.R. at 247; *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 455 (2d Cir.2007)("stating that settlements are important in bankruptcy because they 'help clear a path for the efficient administration of the bankrupt estate'"); and10 *Collier on Bankruptcy* ¶ 9019.01 at 9019–2 ("highlighting that 'compromises are favored in bankruptcy'")); *Buckeye Check Cashing, Inc. v. Meadows* (*In re Meadows*), 396 B.R. 485, 499 (B.A.P. 6th Cir. 2008) (citing *In re Cormier*, 382 B.R. 377, 400–01 (Bankr. W.D. Mich. 2008))("Settlements in bankruptcy cases are favored by law."); *In re West Pointe Properties, L.P.*, 249 B.R. 273, 282 (Bankr. E.D. Tenn. 2000) (quoting *In re Edwards*, 228 B.R. 552, 568–69 (Bankr. E.D. Pa. 1998))("'[I]t is well accepted that compromises are favored in bankruptcy in order to minimize the cost of litigation to the estate and expedite its administration, and that the approval of a compromise is within the sound discretion of the bankruptcy judge.'").

"At the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court." *TMT Trailer*, 390 B.R. at 424 (citation omitted).

In *Olson v. Anderson* (*In re Anderson*), 377 B.R. 865, 870-71 (B.A.P. 6th Cir. 2007), *abrogated on other grounds by Schwab v. Reilly*, 560 U.S. 770 (2010)(footnotes and citations omitted), the court described in detail the "[s]tandard for approval or disapproval of a settlement agreement":

Rule 9019 of the Federal Rules of Bankruptcy Procedure provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The rule offers no guidance as to the criteria to be used in evaluating whether a settlement should be approved, but courts uniformly have drawn from the language of the Supreme Court's decision in *TMT Trailer Ferry* in establishing a "fair and equitable" threshold for settlement approval. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). Although the *TMT Trailer Ferry* case was decided under the Bankruptcy Act, "its principles have been broadly held applicable to settlements under the Bankruptcy Code." 2 *Norton Bankr.L. & Prac.2d* § 41:10 (2007). Many Rule 9019 opinions have relied on *TMT Trailer Ferry* "both for the substantive requirement that settlement represent a fair compromise of disputed issues, and for the requirement that such settlement be preceded by adequate inquiry." *Id.*

The Sixth Circuit Court of Appeals has held that **"the bankruptcy court is charged with an affirmative obligation to** apprise itself of the underlying facts and to **make an independent judgment as to whether the compromise is fair and equitable."** *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir.1988) (emphasis added). **The court must weigh the conflicting interests of all relevant parties, "considering such factors as the probability of success on the merits, the complexity and expense of litigation, and the reasonable views of creditors."** *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988) (citation omitted). "A bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision." *Fishell v. Soltow* (*In re Fishell*), 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb.16, 1995) (unpublished table decision) (quoting *LaSalle Nat'l Bank v. Holland* (*In re Am. Reserve Corp.*), 841 F.2d 159, 163 (7th Cir.1987)); *see also TMT Trailer Ferry*, 390 U.S. at 437, 88 S.Ct. 1157 (holding that bankruptcy court must have the facts in order to make an informed and independent decision).

Although published Sixth Circuit case law on Rule 9019 settlements is relatively sparse, in unpublished decisions the Court

11

> of Appeals and Bankruptcy Appellate Panel have consistently
> reaffirmed their adherence to the "fair and equitable" standard. *See
> Lyndon Prop. Ins. Co. v. Katz*, 196 Fed.Appx. 383, 387 (6th
> Cir.2006); *Bard v. Sicherman* (*In re Bard*), 49 Fed.Appx. 528, 530
> (6th Cir.2002); *In re Fishell*, 47 F.3d 1168, 1995 WL 66622, at *3
> (6th Cir. Feb.16, 1995) (unpublished table decision); *Cook v.
> Terlecky* (*In re Cook*), 336 B.R. 600, 2006 WL 13114, at *3 (6th
> Cir. BAP Jan. 4, 2006) (unpublished table decision); *Porter
> Drywall Co. v. Haven, Inc.* (*In re Haven, Inc.*), 326 B.R. 901, 2005
> WL 927666, at *3 (6th Cir. BAP April 7, 2005) (unpublished table
> decision). Further, the vast majority of appellate courts that have
> addressed the issue have relied upon the same or similar criteria.
> No appellate court has rejected, either expressly or implicitly, the
> efficacy of this approach.

(Emphasis added). The four factors that courts generally consider in evaluating whether a

compromise is "fair and equitable" are:

> (a) The probability of success in the litigation; (b) the difficulties,
> if any, to be encountered in the matter of collection; (c) the
> complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it; (d) the paramount
> interest of the creditors and a proper deference to their reasonable
> views.

*In re High Tech Packaging, Inc.,* 397 B.R. 369, 372 (Bankr. N.D. Ohio 2008)(citing *In re

Fishell,* 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir.1995) (unpublished table decision); *Bard

v. Sicherman (In re Bard),* 49 Fed. Appx. 528, 530 (6th Cir.2002)). "The trustee has the burden

to establish that a motion to compromise is appropriate with respect to these considerations."

*High Tech Packaging*, 397 B.R. at 372.

### B.  The objections to the Motion

### 1.  Debtor's objections

In Debtor's objection to the Motion, Debtor argues that all of the following factors weigh

against approving the Settlement Agreement: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expenses, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[24] With regard to the "probability of success in litigation" factor, Debtor acknowledges that he lost on his claims completely in the state trial court, but Debtor predicts that the Michigan Court of Appeals will reverse the trial court on all of the issues Debtor has argued on appeal.[25]

With regard to the "likely difficulties in collection" factor, Debtor argues that collection on any judgment that the Trustee obtains against Defendants is "virtually assured," because Becker sold one of his companies for $925 million, and also has "tens of millions of dollars" in assets from personal investments, more than enough to satisfy a judgment as high as $14.5 million.[26]

With regard to the "complexity, expense, inconvenience, and delay of the litigation" factor, Debtor argues that the issues on appeal are not complex, and are governed by a well-developed body of law. Debtor argues further that permitting the state court litigation to continue to a resolution will not cause a lengthy delay, or inconvenience, because all that remains to be done in the Michigan Court of Appeals is oral argument, and if there is a remand to the trial court, discovery is complete and the case is ready for trial.[27] Debtor also argues that there would

---

[24] "Debtor's Objection to Chapter 7 Trustee's Motion to Authorize and Approve the Settlement Agreement Compromising the Becker State Court Litigation" (Docket # 491), at 4-11.

[25] *Id.* at 4-7.

[26] *Id.* at 7-8.

[27] *See id.* at 8-9. Although Debtor did not discuss the complexity of the state court litigation in his objection to the Motion, he did address this in his oral argument during the hearing on the Motion.

13

be minimal expense involved in the litigation because quality representation can be obtained without difficulty "on a contingency fee basis, in light of the merits of the case, money at stake, and virtual certainty of collection."[28]

Regarding the "paramount interest of the creditors" factor, Debtor argues that if the settlement is approved, unsecured creditors would receive "a nominal amount, if any," after the payment of all of the secured, administrative, and priority claimants who must be paid before general unsecured creditors receive anything. But "creditors would likely be paid in full on their claims, with even enough left over to distribute to Debtor," if the Trustee prevailed in the state court litigation.[29] Therefore, Debtor says, the settlement is not in the best interest of creditors and should not be approved.

### 2. The objection of Ackerman

Ackerman also filed an objection to the Motion.[30] Ackerman argues the same four factors that Debtor does and echoes the Debtor's arguments.[31] Ackerman argues that: (1) the Trustee has a high probability of success on appeal, because the state trial court misapplied well-established case law on the Spoliation Issue; (2) there will be little difficulty in collecting on a judgment against Defendants, because Defendants have "significant liquid assets"; (3) the state court litigation is not complex as it "just boils down to whether or not the 15% [Oral] Agreement

---

[28] *Id.*

[29] *Id.* at 9-11 (italics omitted).

[30] Ackerman Objection (Docket # 492).

[31] *Id.* at 9-11.

exists or not;" (4) there will be "no cost to the estate [of pursuing the state court litigation ] unless there is a recovery in the case" because the Ackerman Firm is willing to prosecute the case on a contingency fee basis; and any "potential delay is outweighed by the potential recovery of $9,000,000+;" and (5) "the paramount interest of creditors in only met by maximizing the potential recovery from [the state court lawsuit]" rather than settling it for a "meager sum;" and "the Court should afford some deference to [A. Ackerman's] reasonable view that the proposed settlement is not in the best interests of unsecured creditors."[32]

The Trustee and the Becker parties dispute the objecting parties' arguments. (In addition to being a party to the Trustee's proposed settlement, Becker is a large judgment creditor of Debtor.)

### C. Why the objections to the settlement will be sustained

In considering whether the Trustee's proposed settlement is "fair and equitable," the Court will discuss the four settlement factors listed in *High Tech Packaging*, quoted in part III.A of this opinion, among other things.

### 1. The "probability of success in litigation" factor

The Court will discuss this factor in several parts, beginning with issues relating to the parol evidence rule.

### a. The pending state court appeals

There are three components to the appeals currently pending in the Michigan Court of

---

[32] *Id.*

15

Appeals.  The first is the Debtor's appeal[33] of the state trial court's granting of summary

disposition on the Debtor's claims against Becker, based on the parol evidence rule.  The second

part is Becker's cross appeal which argues alternative grounds for affirming the state trial court's

grant of summary disposition in favor of Becker.  The third part is Becker's appeal from the state

trial court's denial of Becker's motion for sanctions against Debtor, based on an argument that the

Debtor's claims against Becker were frivolous.

The Court has read and carefully considered all of the briefs filed by the parties in the

state court appeals.  The Court will discuss the "probability of success" factor separately with

respect to each of these components of the pending appeals.

### i.  Debtor's appeal of the state trial court's summary disposition

The state trial court granted summary disposition against Debtor on Debtor's claim that

he and Becker made an oral agreement for Debtor to receive 15% of the "free cash flow" realized

from ten specified investments owned by Becker Ventures.  The trial court based its decision on

the parol evidence rule, and that decision, in turn, was based on certain terms of the 1999

Operating Agreement of Becker Ventures.  That Operating Agreement states on its first page that

it is an agreement between the two members of the LLC, *i.e.*, Charles E. Becker and the Debtor,

Michael E. McInerney.

The basic problem for the Debtor is that the 1999 Operating Agreement specified two

---

[33] This opinion sometimes refers to the appeal as the "Debtor's appeal" and to the claims against
Becker as the "Debtor's claims"; but this is for convenience only.  The claims at issue are now property of
the bankruptcy estate in this Chapter 7 case, and it is the Trustee who currently has standing and the right
to pursue such claims, and to prosecute the pending state court appeal.  That appeal was originally filed
and briefed by the Debtor, before Debtor's Chapter 11 case was converted to Chapter 7.

16

forms of compensation that Debtor could receive from Becker Ventures, and neither of them

explicitly included the terms of the 15% Oral Agreement. The first was compensation for

Debtor's work as a "Manager" of Becker Ventures; the second was payment that Debtor could

receive by virtue of his 1% membership interest in Becker Ventures. As to the first form of

compensation — Manager compensation — the Operating Agreement stated in § 3.15 that

Debtor and Becker were the Managers of Becker Ventures, and stated in § 3.19:

> 3.19 <u>Compensation of Managers</u>. **The Managers shall be entitled
> to compensation for its services in managing the affairs of the
> Company, which compensation . . . shall be reasonable and
> consistent with competitive industry practices in the area in
> which the Company conducts its business.** The Manager shall
> be entitled to reimbursement of any and all expenses incurred by
> him in connection with providing services to the Company. No
> Member shall be required to perform services for the Company
> solely by virtue of being a Member. **Unless approved by the
> Manager, no Member shall perform services for the Company
> or be entitled to compensation for services performed by the
> Company.**[34]

It is undisputed that while he served as a Manager of Becker Ventures, the Debtor was

paid an annual salary of $300,000.

The second form of possible compensation to Debtor was on account of Debtor's 1%

membership in Becker Ventures. This is detailed in Article V of the 1999 Operating Agreement,

which provided basically that profits of the Company were to be "apportioned" among the

Members in proportion to their percentage interest as set forth in Schedule A. Schedule A, in

turn, provided that the Debtor had a 1% interest.[35]

---

[34] 1999 Operating Agreement at 8-9, § 3.19 (Docket # 507, Ex. 6i)(emphasis added).

[35] *Id.* at 21, § 5.2.1, and Schedule A thereto.

While the 1999 Operating Agreement *did* contain the foregoing provisions for compensation, it *did not* say anything specifically about Debtor receiving 15% of the "free cash flow" of any investments held by Becker Ventures. And the Operating Agreement contained an integration clause, § 8.15, which stated:

> 8.15 <u>Complete Agreement; Governing Law; Jurisdiction</u>. This Agreement constitutes the entire agreement of the Company and the Members and this Agreement supersedes all prior conversations or writings which are merged herein and extinguished.[36]

Based on this integration clause, the state trial court ruled that the 1999 Operating Agreement was a fully integrated agreement. This meant that Michigan's parol evidence rule applied. Under that rule, "'[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements, that *contradict* or *vary* the written contract, is not admissible to vary the terms of a contract which *is clear and unambiguous*.'" *UAW-GM Human Res. Ctr. v. KSL Recreation Corp*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)(quoting *Schmude Oil Co v. Omar Operating Co*, 458 N.W.2d 659, 663 (Mich. Ct. App. 1990)). This is because a fully integrated written agreement requires "a finding that the parties intended the written instrument to be a complete expression of their agreement as to the matters covered." *NAG Enters., Inc. v. All State Indus., Inc.*, 285 N.W.2d 770 (Mich. 1979)(footnote omitted).

The state trial court concluded that the alleged 15% Agreement would vary or contradict the fully integrated 1999 Operating Agreement, including § 3.19 regarding Manager

---

[36] *Id*. at 32, § 8.15. Section 8.15 of the Operating Agreement also provided that the agreement was to be "governed by, construed, and enforced" under Michigan law.

compensation. As a result, the trial court ruled, any evidence of such an oral agreement, and Debtor's claims based upon that oral agreement, were barred by the parol evidence rule.

In reaching this conclusion, the trial court reasoned that the Manager compensation provision of the 1999 Operating Agreement, § 3.19, governed Debtor's claim, because Debtor alleged that he "arranged, supervised, and managed" the ten investments from which Debtor was to receive 15% of the "free cash flow" that Becker Ventures realized. Because of this, the trial court reasoned, "[t]he 15% [A]greement appears to be an effort to compensate [D]ebtor 'for [his] services in managing the affairs of the company.'"[37] (As quoted above, § 3.19 entitled a Manager "to compensation for its services in managing the affairs of the Company.") Because § 3.19 governed Debtor's claim, and did not provide for payment to Debtor of the 15% amount, the trial court reasoned that the alleged 15% Oral Agreement was inconsistent with § 3.19.

In his pending appeal, Debtor argues that the state trial court erred, and that the parol evidence rule does not bar Debtor's claim. Becker argues to the contrary. Having reviewed all of the state court appeal briefs, this Court concludes that if the Trustee's settlement motion is denied, and the pending appeal proceeds, it is highly likely that the Michigan Court of Appeals will reverse the state trial court's ruling based on the parol evidence rule.[38] This is so for the following reasons.

---

[37] January 6 Opinion and Order, Ex. 6.b of Docket # 481 at 5.

[38] In making predictions in this opinion about what the Michigan Court of Appeals will do, this Court is mindful that it is always hard to predict what another court will do in a given case. And of course, the decision is for the Michigan Court of Appeals to make, not this Court. All of the statements in this opinion about what the Michigan Court of Appeals is likely to do are made with humility, and with the utmost respect for that Michigan court's independence and authority.

19

First, even if one accepts the state trial court's conclusion that Debtor's claim is "governed by" the § 3.19 Manager compensation provision in the 1999 Operating Agreement, it is not at all apparent how the alleged 15% Agreement *varies* or *contradicts* § 3.19. Contrary to the state trial court's reasoning, the 15% Agreement could well be fully *consistent with* § 3.19. That section does not specify any particular amount, form, or method of calculating the compensation to be paid to a Manager for that Manager's "services in managing the affairs of the Company." Rather, § 3.19 imposes only three requirements on the compensation to be paid to a Manager: (1) that it be "reasonable;" (2) that it be "consistent with competitive industry practices in the area in which the Company conducts its business;" and (3) when the Manager involved is also a Member of Becker Ventures, that Member's performance of services for the Company and compensation for such services must be "approved by the Manager." (At the time of the 1999 Operating Agreement, the two Managers of the Company were the Debtor and Becker.)

Becker apparently has never argued that the $300,000 salary that Becker Ventures paid Debtor for his management services was not consistent with § 3.19 of the 1999 Operating Agreement. There is no reason, either stated by the state trial court, or by Becker in its appeal briefs, or otherwise apparent to this Court, why Becker, as the other Manager of Becker Ventures, could not have approved (*e.g.* orally agreed to) the Debtor receiving Manager compensation consistent with the 15% Agreement, in addition to Debtor's $300,000 salary, and why such an oral agreement, if it actually existed, would not be fully consistent with § 3.19 by meeting all of that section's requirements. The state trial court itself observed as follows: "Interestingly, like the 15% [A]greement, the compensation that plaintiff received — some $300,000 per year — is not included in the Operating Agreement or any other written agreement

20

provided to the Court. Therefore, if plaintiff was entitled to the $300,00 per year he did receive *pursuant to the Operating Agreement*, he likewise was entitled to 15% of "free cash flow" *pursuant to the Operating Agreement*."[39]

Thus, it is not necessarily true that Debtor's alleged 15% Agreement "varied" or "contradicted" § 3.19 of the Operating Agreement. If such agreed compensation, when combined with Debtor's $300,000 annual salary, met the requirements of § 3.19, listed above, then the 15% Agreement was fully consistent with the 1999 Operating Agreement. If that is so, then rather than varying or contradicting § 3.1.9, the 15% Agreement would simply *implement* § 3.19. And if this is so, then the 15% Agreement is *not* barred by the parol evidence rule.

The state trial court never discussed or decided the issue of whether the alleged 15% Agreement, when combined with Debtor's $300,000 annual salary, met all of the requirements of § 3.19 listed above. Nor could that court have properly decided that issue on the record then before it, as a matter of summary disposition. Rather, the state court simply reasoned that because the compensation provision in § 3.19, which is stated in general terms, did not specifically include the 15% Agreement, the latter agreement was barred by § 3.19. This reasoning seems clearly to be faulty, and it is highly likely that the Michigan Court of Appeals will so rule, upon its *de novo* review of the trial court's summary disposition decision.

There is a second reason why Debtor's appeal seems likely to succeed on the parol evidence issue, and that is based on the terms of the 2001 amendment to the 1999 Operating Agreement. As noted in part I.A.1 of this opinion, the 2001 amendment reduced Debtor's

---

[39] January 6 Opinion and Order, Ex. 6.b of Docket # 481 at 5 (italics in original).

percentage membership interest in Becker Ventures from 1% to zero, and made other changes to the Operating Agreement. That amendment retained Debtor as a Member — Debtor was placed in a newly-created category of "Non-Equity Member" not entitled to vote or receive profit distributions — and added two new Members: the Charles E. Becker Revocable Trust (the "Becker Trust"), which succeeded to Becker's previous 99% membership interest; and CEB Holdings Inc. ("CEB Holdings"), which succeeded to Debtor's former 1% membership interest. In effect, the Becker Trust replaced Becker as the 99% member, and CEB Holdings replaced Debtor as the 1% member. The Becker Trust and CEB Holdings were both controlled by Becker, and he owned CEB Holdings.

Debtor argued in the state trial court, and has argued in the Michigan Court of Appeals, that the 2001 Amendment removed him completely from the coverage of the 1999 Operating Agreement and rendered the provisions of that Agreement inapplicable, except with respect to certain provisions that are irrelevant to this dispute. Thus, according to Debtor, even if the 1999 Operating Agreement otherwise would bar Debtor's claim based on the 15% Agreement under the parol evidence rule, the 2001 Amendment would change that result. The trial court disagreed, and was correct in doing so according to Becker.

This Court finds it highly likely that the Michigan Court of Appeals will rule that the 2001 Amendment is *ambiguous* as to Debtor's argument just described, such that, at a minimum, a genuine issue of material fact existed and precluded the trial court from granting summary disposition in favor of Becker based on the parol evidence rule.

The 2001 Amendment replaced all of Article IV of the 1999 Operating Agreement with a

new Article IV, which stated in pertinent part, the following:

> The Company may have one or more Non-Equity Members.  **A Non-Equity Member's name shall be listed on Schedule A** with a notation that such person is a Non-Equity Member **and has 0% as a current allocation percentage**.  **A Non-Equity member shall have none of the rights, liabilities, or obligations of a Member, and none of the provisions hereof applicable to Members, other than this Article IV and Sections 3.12, 8.2 and 8.7, shall be applicable to a Non-Equity Member**.  A Non-Equity Member shall have the right to attend meetings of the Members but shall not have the right to vote at such meetings.  A Non-Equity Member shall have the authority, if any, granted to it by the Managers.[40]

Schedule A was amended to list the Debtor as a "Non-Equity Member" with a "0" current allocation percentage, and stated that it was effective January 1, 2001.[41]  The 2001 Amendment also deleted Debtor's name from § 5.2.2 as someone entitled to receive monthly payments applicable to Members.[42]

Thus, under the 2001 Amendment's terms, quoted above, "none of the provisions" of the 1999 Operating Agreement "applicable to Members," other than certain specific provisions, "shall be applicable to a Non-Equity Member," — *i.e.*, shall be applicable to Debtor (the only Non-Equity Member).  After stating this, the 2001 Agreement stated in ¶ 4 that "[a]ll of the remaining provisions of the Operating Agreement shall remain in full force and effect."[43]

Debtor argues that after the 2001 Amendment, the Operating Agreement's integration

---

[40] Ex. 6i to Docket # 507, 2001 Amendment at ¶ 1.a (emphasis added).

[41] *Id.* Schedule A.

[42] *Id.* at ¶ 1.b.

[43] *Id.* at ¶ 4.

clause, § 8.15, no longer applied to Debtor at all, but rather only applied to the Equity Members (The Becker Trust; and CEB Holdings). Debtor argues that this is an additional reason why the trial court erred in concluding that after 2001, the Operating Agreement was fully integrated with respect to *the Debtor*. Rather, because all of the Members of Becker Ventures agreed, in the 2001 Amendment, that the § 8.15 integration clause no longer applied to Debtor, the Operating Agreement cannot be viewed as containing the entire agreement of Becker and Debtor with respect to anything, and certainly not with respect to issues of compensation. For this additional reason, among others, Debtor argues in his appeal that the parol evidence rule does not bar his claim based on the alleged 15% Agreement.

If Debtor is correct about the meaning of the 2001 Amendment, the state court will have to enforce that contract accordingly. Under Michigan law, for example, unambiguous contracts "'must be enforced as written.'" *See, e.g., United Rentals (North America) Inc. v. Keizer*, 355 F.3d 399, 407 (6th Cir. 2004)(quoting *Britton v. John Hancock Mut. Life Ins. Co.,* 186 N.W.2d 781, 782 (Mich. Ct. App. 1971)); *see also Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999)(citing *Morley v. Automobile Club of Michigan*, 581 N.W.2d 237, 240 (Mich. 1998)). The Court "'does not have the right to make a different contract for the parties . . . when the words used by them are clear and unambiguous and have a definite meaning.'" *Zurich Ins. Co. v. CCR & Co.*, 576 N.W.2d 392, 395 (Mich. Ct. App. 1997)(quoting *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941)); *see also UAW-GM Human Res. Ctr.*, 579 N.W.2d at 414 (citations omitted). These principles are based on what the Michigan Supreme Court has described as

the bedrock principle of American contract law that parties are free

> to contract as they see fit, and the courts are to enforce the
> agreement as written absent some highly unusual circumstance,
> such as a contract in violation of law or public policy.

*Wilkie v. Auto-Owners Ins. Co.,* 664 N.W.2d 776, 782 (Mich. 2003).

This Court concludes that the 2001 Amendment is ambiguous as to whether the § 8.15 integration clause no longer applies to Debtor. This is an additional reason why the Court concludes that the Michigan Court of Appeals is highly likely to reverse the state trial court's grant of summary disposition.

The 2001 Amendment is ambiguous because it says that "none of the provisions" of the Operating Agreement ***"applicable to Members,"*** other than specified provisions not relevant here, "shall be applicable to a Non-Equity Member" (bold and italics added). The ambiguity is created by the phrase "applicable to Members." The ambiguity concerns whether to give that limiting phrase a broad reading or a narrow one. Under a broad reading, if a provision of the 1999 Operating Agreement has any application to any person who happens to be a Member of Becker Ventures, that provision no longer applies to Debtor, except for the specified irrelevant sections. Under this broad reading, § 8.15's integration clause would no longer apply to Debtor, because that provision certainly has some application to Members of the Company. Indeed, the integration clause specifically refers to Members and says that "[t]his Agreement constitutes the entire Agreement of the Company **and the Members** and this Agreement supersedes all prior conversations or writings which are merged herein and extinguished." (Emphasis added).

It is possible, however, to give the phrase "applicable to Members" a narrower reading — namely, that it means that provisions of the Operating Agreement no longer apply to Debtor only

to the extent they apply specifically to Members.  Under this narrower reading, one can reasonably argue that on the one hand, § 8.15's integration clause does not apply to Debtor in his capacity as a "Member" (albeit a "Non-Equity Member") of Becker Ventures; but on the other hand, § 8.15 does continue to apply to Debtor in all other capacities, including in his capacity as a Manager of Becker Ventures.  And as a Manager of Becker Ventures, Debtor remains subject to the § 3.19 Manager compensation clause, which the trial court held governs Debtor's claim. Under this narrower reading of the 2001 Amendment, the 1999 Operating Agreement remained a fully integrated agreement with respect to the § 3.19 Manager compensation provision, as applicable to Debtor.  And if this is so, the parol evidence rule would apply to bar Debtor's claim under the 15% Agreement, *if* the trial court's reasoning regarding § 3.19 otherwise were correct (which it is not, as discussed above).

The 2001 Amendment may reasonably be interpreted in either of the two ways just described (broadly or narrowly), so it is ambiguous.  Under Michigan law, the question of whether terms of a contract are ambiguous is a question of law for the court.  *See Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999)(citing *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228 (Mich. 1996)).  If a contract is unambiguous, its meaning is a question of law for the court.  If the language is ambiguous, however, its interpretation is a question of fact.  *See UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)(citing *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996)).  A contract is ambiguous only if "its words may reasonably be understood in different ways."  *Raska v. Farm Bureau Mut. Ins. Co. of Mich.,* 314 N.W.2d 440, 441 (Mich. 1982); *see also Rossow v. Brentwood Farms Dev. Inc.,* 651 N.W.2d

458, 462 (Mich. Ct. App. 2002)(citation omitted).

Because the 2001 Amendment is ambiguous, the Michigan Court of Appeals is likely to rule that the state trial court committed error in rejecting Debtor's argument that the 2001 Amendment made the § 8.15 integration clause no longer applicable to Debtor. Due to this ambiguity, the state trial court could not rule out Debtor's interpretation of the 2001 Amendment and reject Debtor's argument on a motion for summary disposition. Rather, extrinsic evidence would be admissible, and a trial required, to determine what meaning the parties intended with the ambiguous language in the 2001 Amendment. And in that situation, the parol evidence rule does not bar extrinsic evidence. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003). As the Michigan Supreme Court explained in *Klapp*,

> It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury. *Hewett Grocery Co. v. Biddle Purchasing Co.*, 289 Mich. 225, 236, 286 N.W. 221 (1939). "'Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions.'" *O'Connor v. March Automatic Irrigation Co*, 242 Mich. 204, 210, 218 N.W. 784 (1928)(citation omitted).

> Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract. Thus, the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning. [11 Williston, Contracts (4th ed.), § 30:7, pp. 87-91.]

In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the jury is to consider relevant extrinsic evidence. As this Court explained in *Penzien v. Dielectric Products Engineering Co., Inc*, 374 Mich. 444, 449, 132 N.W.2d 130 (1965):

> "If the contract in question were ambiguous or 'doubtful,' extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in construction of the disputed terms."

> "The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." [Citations omitted.]

Looking at relevant extrinsic evidence to aid in the interpretation of a contract whose language is ambiguous does not violate the parol evidence rule.

*Id.*

This is another reason why the Court concludes that the Michigan Court of Appeals is very likely to reverse the state trial court's summary disposition ruling based on the parol evidence rule. There may well be other reasons that support this conclusion, based on other arguments that Debtor has made in his appeal briefs in the state court, but the two main points the Court has made in this opinion sufficiently support the Court's conclusion about the Debtor's high probability of success on appeal.

### ii. Becker's cross-appeal/alternative arguments for affirmance

As noted in footnote 8 of this opinion, in their first motion for summary disposition in the

state trial court, the Becker Defendants argued that Debtor's claims were subject to binding

arbitration, and that the claims were time barred, under Section 7.11 of the Operating Agreement,

because Debtor had not "submitted" his claims to the Company "within thirty [30] days of the

occurrence of any Dispute." The state trial court found that Defendants had waived these

defenses, and denied Defendants' motion. In their cross appeal, Defendants renew their

argument based on the arbitration clause, as an alternative ground for affirming the trial court's

summary disposition of Debtor's claims. Debtor disputes this argument, and the parties have

briefed this issue at length.

This Court finds it likely that the Michigan Court of Appeals will reject the Becker

Defendants' arbitration-related arguments, for the following reasons.

Section 7.1 of the 1999 Operating Agreement and its first subpart, section 7.1.1, state:

> 7.1 <u>Arbitration</u>. It is mutually agreed between the parties that arbitration, in accordance with the provisions of MCLA §600.5001 <u>et. seq.</u>, as amended, shall be the sole and exclusive remedy with respect to the resolution of any dispute, claim or controversy involving the interpretation of this Agreement, or the terms, conditions, termination of, or enforcement of the Members' obligations set forth herein ("Dispute"). It is the intention of the parties that any decision resulting from the arbitration shall be final and binding upon the parties and that a judgment of the Circuit Court for the County of Macomb may be rendered upon the arbitration award made pursuant to this Agreement. Any and all Disputes shall be resolved, and, if necessary, submitted to arbitration, pursuant to the following procedure:

> > 7.1.1 Any and all Disputes shall be submitted in writing ("Notice") by a party to the Manager of the Company within thirty (30) days of the occurrence

of any Dispute.[44]

The Operating Agreement then goes on to describe a process and time frames for an initial

meeting; mediation; and then binding arbitration.  Section 7.1.7 says that "[a]ny Dispute shall be

deemed waived and fully satisfied unless presented within the time periods specified in

Paragraphs 7.1.1 through 7.1.4."[45]  Section 7.1.9 says that "the decision of the arbitrator" is the

"sole and exclusive remedy for any breach of the terms of this Agreement."[46]

The state trial court held that the Becker Defendants waived their arbitration-related

arguments.  As quoted in one of Debtor's state court appeal briefs, the trial court reasoned as

follows, in a bench opinion and written order, both issued on June 23, 2010:

> Specifically, at the June 23, 2010 hearing, the Circuit Court found:

> > MCR 2.111(F)(3) requires a party to state
> > affirmative defenses in its responsive pleading . . . .
> > It further requires that under a separate and distinct
> > heading the party must state the facts constituting
> > the existence of an agreement to arbitrate. A defense
> > not asserted in the responsive pleading or by motion
> > as provided in these court rules is waived. MCR
> > 2.111(F)(2).

> > Defendant argues that paragraph 10 of its
> > affirmative defenses satisfies this requirement.
> > Paragraph 10 states that: The claims are barred to
> > the extent they vary or contradict other written
> > agreements.

---

[44] 1999 Operating Agreement at 26, §§ 7.1, 7.1.1 (Docket # 507, Ex. 6i).

[45] *Id.* at 27, § 7.1.7.

[46] *Id.* at 27, §§ 7.1.9.

The Court finds that this statement is inadequate to assert . . . ["]the existence of an agreement to arbitrate.["] See MCR 2.111 (F)(3). Further, the statement does not state the facts constituting an agreement to arbitrate. As a consequence, the Court finds that the defendant failed to properly plead the existence of an agreement to arbitrate in his first responsive pleading. Therefore, the Court finds that the defendant has waived that defense. MCR 2.111(F)(2).

Because the . . . defendant's arguments concerning the contractual limitations period and requirement to arbitrate each rely on the arbitration clause in the arbitration agreement and because defendant has waived the existence of the arbitration agreement as a defense, summary judgment relying on same is inappropriate. Accordingly, defendant's motion for summary disposition pursuant to MCR 2.116(C)(7) or alternatively to compel arbitration is denied. It is so ordered.

A written order issued the same day mirrored the Circuit Court's oral ruling.

Plaintiff argues that defendant has failed to plead in his responsive pleading the affirmative defense "existence of an agreement to arbitrate". Both of defendant's arguments regarding the contractual limitations period and the requirement to arbitrate rely on the arbitration clause in the [O]perating [A]greement. MCR 2.111(F)(3) requires a party to state affirmative defenses in its responsive pleading. It further requires that "under a separate and distinct heading, the party must state the facts constituting . . . the existence of an agreement to arbitrate." Id. "A defense not asserted in the responsive pleading or by motion as provided in these court rules is waived." MCR 2.111(F)(2).

Defendant alleges that paragraph 10 of its affirmative defense satisfies this requirement. Paragraph 10 states that "the claims are barred to the extent they vary or contradict other written agreements." The Court finds that this statement is inadequate to assert "the existence of an agreement to arbitrate." MCR 2.l11(F)(3). Further, the statement does not "state the facts constituting . . . an agreement to arbitrate." Id. As a consequence, the Court finds that the defendant failed to properly plead "the existence of an agreement to arbitrate" in his first responsive pleading. Id. Therefore, defendant has waived that defense. MCR 2.11 l(F)(2). **Because defendant's arguments concerning the contractual limitations period and requirement to arbitrate each rely on the arbitration clause in the [O]perating [A]greement, and because defendant has waived the existence of the arbitration agreement as a defense, summary disposition is inappropriate.**[47]

In their appeal briefs, the Becker Defendants attack the state trial court's ruling and Debtor defends it. And in further support of the trial court's waiver finding, Debtor argues (1) that the Becker Defendants never properly moved for leave to amend their answer and affirmative defenses to assert the arbitration-related provisions of the 1999 Operating Agreement; and (2) that Becker waived the provisions in the arbitration clause, including the 30-day deadline to submit Debtor's claim to a Manager of the Company contained in Section 7.1.1 of the 1999 Operating Agreement, not only by failing to properly plead it as an affirmative defense, but also by Becker's conduct in litigating Debtor's claim on the merits in the state trial court for over 8 months before ever raising the arbitration clause defense. Becker raised that defense for the first

---

[47] Debtor Br. on Appeal for Docket No. 304411 (Docket # 513, Ex. 4) at 9-10 (emphasis added, internal record citations omitted).

time in its April 22, 2010 summary disposition motion.

In addition, Debtor argues in his appeal brief that the 2001 Amendment to the 1999 Operating Agreement made Section 7.1 and all of its subparts inapplicable to Debtor. Becker disputes this argument. (The 2001 Amendment is discussed in detail in part III.C.1.a.i of this opinion.)

This Court has carefully considered all of the parties' competing arguments in their appeal briefs.[48] The Court finds that the Michigan Court of Appeals is likely to affirm the state trial court's ruling that the Becker Defendants waived the arbitration-related defenses. The appellate court is likely to rule that this waiver occurred both by Becker's litigation conduct, and by Becker's failure to properly plead the affirmative defense of "the existence of an agreement to arbitrate," as required by MCR 2.111(F)(3)(a), including the related 30-day deadline to submit a "Dispute" to the Manager of the Company, contained in Section 7.1.1 of the 1999 Operating Agreement. In addition, the appellate court is likely to rule that the state trial court did not abuse its discretion in failing to grant Becker leave to amend its pleadings, for reasons including the ground that Becker failed to ever properly move for leave to amend its pleadings.

Even if the Michigan Court of Appeals were inclined to rule that Becker did not waive its defenses based on the arbitration-related provisions of the 1999 Operating Agreement, the appellate court would be very likely to conclude that the 2001 Amendment to the 1999 Operating Agreement is *ambiguous* as to whether that amendment made all of the arbitration-related provisions (Sections 7.1, 7.1.1 and all the other subparts of Section 7.1) inapplicable to Debtor.

---

[48] The appeal briefs regarding Becker's cross-appeal on the arbitration clause-related arguments are in the record of this case at Docket # 513.

33

This ambiguity exists for the same reasons this Court has discussed in part III C.1.a.i of this opinion, with respect to the compensation provision (Section 3.19) and the integration clause (Section 8.15) of the 1999 Operating Agreement, and the parol evidence rule. Under the broad reading of the 2001 Amendment, one of the two reasonable readings discussed earlier, Section 7.1 and all of its subparts are "applicable to Members" and therefore were rendered inapplicable to Debtor by the 2001 Amendment. Because the ambiguity on this issue cannot be resolved on a motion for summary disposition, the Michigan Court of Appeals likely would remand this issue for trial, *even if* that Court rejected the trial court's ruling that Becker waived the arbitration-related defenses.

For these reasons, this Court finds it likely that the Michigan Court of Appeals would reject the Becker Defendants' arbitration-related arguments, as an alternative basis for affirming the trial court's summary disposition against Debtor.

### iii. Becker's separate appeal seeking sanctions

Becker's separate appeal seeking sanctions against Debtor is very unlikely to succeed, because it is dependent upon, among other things, a finding that Debtor's claims in the trial court were frivolous. Such a finding is improbable, given this Court's finding that Debtor's appeal of the trial court's adverse summary disposition likely would be successful.

### b. The likelihood of ultimate success on remand to the state trial court, if Debtor's pending appeal is successful

Although this Court finds it likely that the Michigan Court of Appeals would reverse the state trial court's summary disposition of Debtor's claim, such a reversal would not guarantee

ultimate success on Debtor's claims against Becker. Rather, it only would lead to a remand to the trial court, for a trial on Debtor's claims. In order to prevail at such a trial, Debtor would have to persuade the trier of fact that the 15% Oral Agreement existed, something that Becker denies. To support such an effort, Debtor would have his own testimony that he and Becker made the alleged oral agreement, and presumably, Becker would testify that he made no such agreement with Debtor. The spoliation issue, discussed below, *might* give Debtor considerable help in proving the existence of the 15% Agreement. And if the trier of fact found that the agreement did exist, Debtor would have to prove the amount of damages for Becker's breach of that agreement. (There is no dispute about *breach* — it is undisputed that Becker has never paid Debtor anything that could be viewed as a payment due under the alleged 15% Agreement.)

The probability of success on Debtor's claim at a trial on remand is discussed briefly in the next parts of this opinion.

**1. The existence of the alleged 15% Oral Agreement, and the spoliation issue**

If we assume that the Debtor's appeal is likely to prevail, as this Court finds is likely, then the next question is what is the probability of successfully persuading the trier of fact that the 15% Oral Agreement actually existed — *i.e.*, that Debtor and Becker made such an oral agreement. Understandably, the Trustee has been focused primarily on assessing the probability of success on the pending appeal. But the Trustee has not presented any persuasive argument as to what the probability of success would be at trial, if the Debtor's pending appeal succeeds. Unless the spoliation issue leads to a presumption adverse to Becker, as discussed below, this probability-of-success issue probably will turn on the trier of fact's assessment of who was the

more credible witness at trial — Debtor or Becker. The record before this Court does not enable the Court to determine which competing witness is likely to be believed by a trier of fact.

While the Court does give "some deference" to the Trustee's judgment in seeking to settle the claim against Becker, *see, e.g., In re MQVP, Inc.*, 477 Fed. Appx. 310, 313 (6th Cir. 2012) (citations omitted), the Court is required to exercise independent judgment regarding the factors relevant to the reasonableness of the settlement. *See* discussion in part III.A of this opinion. Here, the moving party (the Trustee) has not presented any persuasive reason why, or a record upon which, the Court could or should find that there is a *low* probability of success of Debtor's persuading a trier of fact that the 15% Oral Agreement existed. Under these circumstances, the Court cannot simply assume a low probability of success; rather, the Court concludes that there is at least a reasonable probability of success.

The spoliation issue, which is much-debated in the Debtor's and Becker's appeal briefs, is such that on the present record, this Court cannot reasonably predict whether Debtor is likely to succeed on that issue. But that issue can only help the likelihood of success on Debtor's claim; it cannot hurt it. If Debtor does succeed on the spoliation issue, at a minimum there will be a presumption that the destroyed/missing evidence was favorable to Debtor — *i.e.*, that it tended to show that the Debtor and Becker *did* make the alleged 15% Oral Agreement.

The state trial court described Michigan law on spoliation this way:

> In Michigan, the trial court has the inherent authority to sanction a culpable party that destroys or loses material evidence, whether intentionally or unintentionally, that it knows or should know is relevant to the case, and the other party is unfairly prejudiced because it is unable to challenge or respond to the evidence. *Brenner v Kolk*, 226 Mich App 149, 160 (1997). There is also a

general rule that if a party intentionally destroys evidence that is relevant to a case, a presumption arises that the evidence would have been adverse to that party's case. *Ward v Consolidated Rail Corp*, 472 Mich 77, 84 (2005).[49]

The trial court denied any relief to Debtor for Becker's alleged spoliation of evidence, on the ground that the destroyed/missing evidence was not material evidence. This was because even if such evidence tended to show that Debtor and Becker had made the alleged 15% Oral Agreement, such evidence was barred by the parol evidence rule. The trial court also appears to have reasoned that Debtor failed to show that any of the destroyed/missing evidence tended to prove the existence of the alleged oral agreement.[50]

The first of these reasons by the trial court is likely to fall away, because the Michigan Court of Appeals is likely to rule that the parol evidence rule does *not* bar Debtor's claim, and does not bar extrinsic evidence of the alleged oral agreement. *See* discussion in part III.C.1.a.i of this opinion.

As to the second of the trial court's reasons for denying relief based on spoliation, Debtor argues at length in the pending appeal that the trial court erred by placing the burden on Debtor to show that the destroyed/missing evidence was relevant — *i.e.*, that it tended to show the existence of the alleged 15% Oral Agreement. Rather, Debtor argues, the law places the burden on *Becker* to show that any destroyed/missing emails or other electronic evidence was *not* relevant to show the existence of the alleged 15% Oral Agreement.

---

[49] May 17 Opinion and Order (Ex. 6c of Docket # 481) at 10; *see also* January 6 Opinion and Order (Ex. 6b of Docket # 481) at 9.

[50] *See* January 6 Opinion and Order at 10; May 17 Opinion and Order at 10-11.

Becker disputes this argument by Debtor, and also contends that the admissible evidence in the record before the trial court failed to show that Becker destroyed any relevant emails or other electronic evidence.

The spoilation issue in this case appears to be factually complicated and detail-intensive. Having found that the Michigan Court of Appeals is likely to reverse the trial court on the parol evidence rule issue, and remand the case for trial, this Court also finds it likely that the appellate court will also instruct the trial court, on remand and before trial, to hold an evidentiary hearing and make factual findings regarding whether all of the necessary elements for spoilation sanctions in fact are established, and if so, what sanction(s) are appropriate. On the present record, this Court cannot make any prediction about what the result on such a remand will be. But the result will either help Debtor's case, or be neutral (neither helping nor hurting Debtor's case.)

### 2. The amount of damages and the collectibility factor

In addition to the fact that there is a pending state court appeal that appears to have merit, another major reason why the Trustee's Motion is rather difficult to decide is that the damages amount of Debtor's claim is very large. And no one disputes that Becker is likely to be fully collectible if a judgment is obtained in the full amount of the damages sought.

The claim is for in excess of $9 million,[51] and according to Debtor's testimony it could be as high as $14.5 million. In any case, it appears that the damages amount substantially exceeds

_____

[51] The number of $9 million-plus in damages is alluded to in the Affidavit of Alan Ackerman, one of Debtor's state-court attorneys (Docket # 492, Ex. 1 at ¶¶ 33, 39). During the hearing on the Trustee's Motion, Debtor's attorney said that this number in the Ackerman affidavit was after deducting a contingent attorney fee. But the Ackerman affidavit does not say this.

the total amount of the likely allowed claims to be paid in this Chapter 7 bankruptcy case. And the damages amount is very large compared to the $250,000 amount of the Trustee's proposed settlement. Yet, in absolute terms, $250,000 itself is not an insubstantial amount.

In his reply brief and at the hearing on the Trustee's motion, the Trustee argued that the Debtor had not presented the Trustee with any damages calculation or other evidence tending to show what amount of damages could be recovered, if the claim were successful as to liability. Debtor's counsel responded during the hearing by saying that Debtor has an 80-page report from Becker's accountant, obtained in discovery in the state court litigation, that supports a damage claim of $13-14.5 million, based on 15 % of approximately $95 million in free cash flow from the investments covered by the alleged 15% Oral Agreement. (The Court notes that 15% of $95 million equals $14.25 million.)

At the hearing, Trustee's counsel said that the Trustee had not received this report. So the Trustee has not yet investigated or evaluated this damages report. Nor is any part of this 80-page report in the record in this case.[52]

In addition, the Trustee's reply brief cites to testimony that Debtor gave in a Rule 2004 examination in this case on August 23, 2012, in which Debtor testified:

> Q. Is it true that on Page 17 and on Page 20 of the plan you state that you . . . estimate "that the value of the Becker Claim approximates $14.5 million"?
>
> A. That's correct.

---

[52] During the hearing, counsel for Becker urged the Court to disregard the assertions of Debtor's counsel about the 80-page report. Becker's counsel also said, without elaboration, that Becker contends that the damages amount will end up being zero, if the state court lawsuit ever goes to trial.

Q.  Who did the valuation of this claim? Who valued the claim in that amount?

A.  I valued it and Mr. Becker provided discovery in the state court litigation that substantiated that number, approximately.

Q.  What particularly was that discovery?

A.  A[n] extensive series of calculations on the, all the various investments.

Q.  Are you saying that Mr. Becker provided calculations to you?

A.  Correct.

Q.  And do you have those documents in your possession?

A.  No.

Q.  Do you have them -- you don't have them in your possession at all?

A.  Sitting here today?

Q.  No. In your possession, custody and control.

A.  Yes. Yes, I do.

Q.  Where are they currently located?

A.  Some of them are at my home and some of them are at my lawyer's office.

Q.  What steps precisely, and step by step, did you take to arrive at that claim amount?

A.  I approximated the cashflow on the various investments that are part of the deal.

Q.  What documents did you rely on in valuing that claim, besides the Becker documents that you mentioned earlier?

A.  The financial records that I had from my time with Becker Ventures.

Q.  During what time period were you with Becker Ventures?

A.  1998 to 2007, I believe, 2006 or 7.[53]

Based on the foregoing, the Court concludes that the Trustee has not presented any persuasive argument or evidence that the damages amount is likely to be smaller than the range of $9 to $14.5 million, if the Debtor's claim prevails as to liability.  Therefore, under the circumstances, the Court will assume, for purposes of deciding the Trustee's Motion, that such damages amount is likely to be in the range of $9 to $14.5 million.

**3.  The "complexity and expense of litigation" factor**

The only aspects of Debtor's claim that might be rather complex, factually, to litigate, if the Trustee's proposed settlement is not approved, are the spoliation issue and possibly the issue of the damages amount.

The Trustee's litigation of these issues, and the other issues in prosecuting the claim

---

[53]  Tr. of Michael McInerney Rule 2004 Examination (Docket # 481, Ex.6h) at 45-47.

41

against Becker to conclusion, is not likely to be unduly expensive to the bankruptcy estate, because the Trustee will be able to hire special counsel to prosecute the claim on a contingency fee basis. Indeed, before Debtor filed this bankruptcy case, the Ackerman Firm had agreed to represent Debtor in his litigation of the claim against Becker, on a one-third contingency basis,[54] and that firm prepared and filed the extensive briefs in Debtor's pending appeal. And on November 9, 2011, while this bankruptcy case was still in Chapter 11, the Debtor obtained this Court's approval for the Ackerman Firm to continue representing the Debtor (then a Chapter 11 Debtor-in Possession) in the litigation, on the same one-third contingency fee basis.[55] After the case was converted to Chapter 7 on November 2, 2012, and so far to date, the Trustee has declined to employ the Ackerman Firm as special counsel. But that firm remains willing to be employed on the same one-third contingency fee basis,[56] and obviously is very familiar with the facts and legal issues in the state court litigation of Debtor's claim against Becker.

Even if the Trustee continues in his unwillingness to employ the Ackerman Firm as special counsel, the Trustee has not presented any persuasive reason or evidence to suggest that he could not obtain other competent counsel to represent him on a one-third contingency basis. It thus appears that the Trustee has the ability to litigate the claim against Becker to conclusion without the estate paying any attorney fees for such litigation, unless and until a recovery is obtained.

The Trustee is no doubt correct that continued litigation of the claim against Becker will

---

[54] *See* Docket # 492, Exs. 1 and 4.

[55] Docket ## 96, 101.

[56] *See* Ackerman Firm's objection to the Trustee's Motion (Docket # 492) at 11.

result in the estate incurring some expenses.  But the Trustee has not presented any estimate of what or how much such future expenses might be, or given the Court any basis or evidence on which to estimate the amount of such expenses.

### 4.  The "paramount interest of creditors" factor

In addition to the Debtor, four creditors filed objection to the Trustee's Motion — Alan Ackerman; the Ackerman Firm; Michael Stechshulte, and Mark McInerney.  The Court has considered the views of these objecting creditors, and finds reasonable and persuasive their arguments, also made by Debtor, that if the proposed $250,000 settlement with Becker is approved, the general unsecured creditors will get very little or nothing from the settlement, because Chapter 7 and Chapter 11 administrative claims and other priority claims will have to be paid first.  And the general unsecured creditors will lose an opportunity to realize much more in distributions in this case if the claim against Becker is pursued to judgment (or ultimately, to a much larger settlement.)

### 5.  The Court's decision on the Trustee's Motion

Based on the factors discussed above, and for the reasons stated above,[57] the Court concludes that the Trustee's proposed settlement is not fair and equitable, is unreasonably low, is not in the best interests of creditors and the estate, and should not be approved.

In making this ruling, the Court must add that although it is disapproving this settlement,

---

[57]  In making its decision on the Trustee's Motion, the Court finds it unnecessary to discuss all of the issues argued in the parties' papers or at the hearing on the Motion, such as the amount and nature of the claim that the Ackerman Firm may have in this case for its work done on the claim against Becker before this case was converted to Chapter 7.

43

the Court appreciates the Trustee's efforts so far to settle the claim against Becker. It is unusual

for this Court to disapprove a settlement; settlements are indeed favored in bankruptcy. *See* part

III.A of this opinion. But this settlement motion presents very unusual circumstances.

## IV. Conclusion

For the reasons stated in this opinion, the Court will enter an order denying the Trustee's

motion for approval of the settlement with the Becker parties.

**Signed on October 17, 2013**                    **/s/ Thomas J. Tucker**_____
                                                   **Thomas J. Tucker**
                                                   **United States Bankruptcy Judge**